**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

PERSONAL SERVICES CONTRACTOR ASSOCIATION
*Plaintiff-Appellant,*

*v.*

DONALD TRUMP, ET AL.
*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-469 (Hon. Carl J. Nichols)

———————————

**BRIEF OF APPELLANT**

———————————

JOSHUA KARSH
*Mehri & Skalet PLLC*
*2000 K St., NW, Ste. 325*
*Washington, D.C. 20006*
*jkarsh@findjustice.com*
*(773) 505-7533*

MARNI WILENSON
*Willenson Law, LLC*
*3420 W. Armitage Ave., Ste. 200*
*Chicago, IL 60647*
*(312) 546-4910*

CAROLYN E. SHAPIRO*
*Schnapper-Casteras PLLC*
*200 E. Randolph St., Ste. 5100*
*Chicago, IL 60601*
*(312) 520-7533*

*\*Member of the Illinois bar with a D.C.
practice limited to federal litigation.
Not a member of the District of
Columbia bar.*

*Counsel for Plaintiff-Appellant*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

As required by Circuit Rules 27(a)(4) and 28(a)(1), counsel for Appellant Personal Services Contractor Association provides the following information:

**A.   Parties and Amici Appearing Below**

The parties who appeared before the U.S. District Court were *Plaintiff-Appellant* the Personal Services Contractor Association and *Defendant-Appellees* Donald Trump, President of the United States; the U.S. Department of State; the U.S. Agency for International Development (USAID); Marco Rubio, Secretary of State and Acting Administrator of USAID; Jeremy Lewin, Deputy Administrator and Chief Operating Officer of USAID; the Office of Management and Budget (OMB); Russell Vought, OMB Director; the United States DOGE Service, f/k/a the United States Digital Service; U.S. DOGE Temporary Service, a/k/a the "Department of Government Efficiency"; the Department of Government Efficiency; the U.S. Department of Treasury; and Scott Bessent, Secretary of the Treasury.

In the district court, the Constitutional Accountability Center was an amicus curiae.

## B. Parties and Amici Appearing in this Court

The parties appearing in this Court are the Personal Services Contractor Association, as *Plaintiff-Appellant*, and *Defendant-Appellees* Donald Trump, President of the United States; the U.S. Department of State; the U.S. Agency for International Development (USAID); Marco Rubio, Secretary of State and Acting Administrator of USAID; Jeremy Lewin, Deputy Administrator and Chief Operating Officer of USAID; the Office of Management and Budget (OMB); Russell Vought, OMB Director; the United States DOGE Service, f/k/a the United States Digital Service; U.S. DOGE Temporary Service, a/k/a the "Department of Government Efficiency"; the Department of Government Efficiency; the U.S. Department of Treasury; and Scott Bessent, Secretary of the Treasury.

As of this filing, there are no intervenors or amici curiae in this Court.

## C. Rulings Under Review

The ruling under review in this case is the July 25, 2025 Memorandum Opinion and Order of the U.S. District Court for the District of Columbia (Judge Carl J. Nichols), denying Plaintiff-Appellant's motion for a preliminary injunction. JA853, 854-90. There are no official reporter

citations for the opinion and order, but the opinion is available on Westlaw at 2025 WL 2097574.

### D.   Related Cases

This case has not previously been before this Court or any other court. There are several related pending cases involving similar issues within the meaning of D.C. Circuit Rule 28(a)(1)(C):

• *American Fed'n of Government Employees v. Trump*, No. 25-cv-352 (D.D.C.), currently before this Court as Appeal No. 25-5290.

• *AIDS Vaccine Advoc. Coalition v. U.S. Department of State*, No. 25-cv-400 (D.D.C.) and *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C.), currently before this Court as consolidated appeals Nos. 25-5317 and 25-5319, and previously before this Court as consolidated appeals Nos. 25-5046 and 25-5047, 2025 WL 621396 (D.C. Cir. Feb. 26, 2025), and Nos. 25-5098 and 25-5097, 153 F.4th 1 (D.C. Cir. 2025).

• *J. Does 1-26 v. Musk*, No. 8:25-cv-462 (D. Md.), currently before the Fourth Circuit as Appeal No. 25-1273.

November 26, 2025

Respectfully submitted,

*/s/ Joshua Karsh*

*One of the Counsel for Plaintiff-Appellant*

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Plaintiff-Appellant makes the following disclosure:

Plaintiff-Appellant Personal Services Contractor Association is an unincorporated voluntary membership association headquartered in Washington, D.C., with no parent corporation and no stock.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .......... i

RULE 26.1 DISCLOSURE STATEMENT ......................................................... iv

TABLE OF AUTHORITIES ............................................................................... viii

GLOSSARY ............................................................................................................. xvii

INTRODUCTION ..................................................................................................... 1

JURISDICTIONAL STATEMENT ....................................................................... 4

STATEMENT OF THE ISSUES ............................................................................ 5

STANDARD OF REVIEW ...................................................................................... 6

PERTINENT STATUTES ....................................................................................... 6

STATEMENT OF THE CASE ................................................................................ 6

   A.   Statutory and Regulatory Background ..................................................... 6

   B.   Factual Background .................................................................................... 12

   C.   Procedural Background ............................................................................ 19

SUMMARY OF ARGUMENT ............................................................................... 27

ARGUMENT ............................................................................................................. 32

   I.   The district court erred in confining the PSCA's likely standing to claims challenging the termination of its members' employment ...... 32

II.  The district court also erred by concluding that the Contract
     Disputes Act likely divested it of jurisdiction. ........................................39

     A.  The Contract Disputes Act does not strip the district court of
         jurisdiction over the PSCA's claims.....................................................40

     B.  The Supreme Court's recent emergency-docket order and
         accompanying opinions in NIH v. American Public Health
         Association confirm the district court's § 1331 jurisdiction here. ..46

III. The PSCA satisfied every requirement for preliminary relief, and the
     district court committed legal error when it concluded otherwise ....49

     A.  The PSCA is not merely likely but very likely to succeed on the
         merits. ...................................................................................................49

         1.  The PSCA's separation-of-powers claim.......................................50

         2.  The PSCA's Take Care Clause claim..............................................51

         3.  The PSCA's APA claim for arbitrary and capricious agency
             action. .............................................................................................51

         4.  The PSCA's APA claim for agency action not in accordance
             with law. .........................................................................................54

         5.  The PSCA's ultra vires claim..........................................................54

     B.  The district court erred by using the wrong legal standard for
         evaluating irreparable harm and by ignoring both the nature of
         the harm and the consequences of not acting. ..................................56

         1.  The district court applied the wrong legal standard..................56

         2.  The district court seriously misconceived the nature of the
             harm here........................................................................................57

3. The district court misapplied the law by ignoring the core purpose of preliminary relief..........................................................58

C. The district court erred by treating the President's defiance of Congress as weighing in his favor and by failing to address the PSCA's overwhelming—and undisputed—evidence of the broader public interests at stake..............................................................61

CONCLUSION ......................................................................................63

CERTIFICATE OF COMPLIANCE ....................................................65

CERTIFICATE OF SERVICE ...............................................................66

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Aiken County*,
 725 F.3d 255 (D.C. Cir. 2013)............................................................51

*Andrade v. Lauer*,
 729 F.2d 1475 (D.C. Cir. 1984).....................................................37, 38

*Axon Enter., Inc. v. Federal Trade Comm'n*,
 598 U.S. 175 (2023)................................................38, 40, 41, 42, 45

*Bond v. United States*,
 564 U.S. 211 (2011)........................................................................35, 36

*Bowen v. Massachusetts*,
 487 U.S. 879 (1988).................................................................43, 45, 46

*California v. Department of Education*,
 769 F.Supp.3d 72 (D. Mass. 2025) ...........................................47

*Clinton v. City of New York*,
 524 U.S. 417 (1998)........................................................................37, 55

*Collins v. Yellen*,
 594 U.S. 220 (2021)........................................................................36, 37

*Colorado River Water Conservation Dist. v. United States*,
 424 U.S. 800 (1976)..............................................................................39

*Crowley Gov't Servs., Inc. v. GSA*,
 38 F.4th 1099 (D.C. Cir. 2022) ...........................................42

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
 591 U.S. 1 (2020)...................................................................................52

*Department of Education v. California,*
    604 U.S. 650 (2025) (per curiam) ......................................................46, 47, 49

*Department of State v. AIDS Vaccine Advocacy Coal.,*
    606 U.S. __, 2025 WL 2740571 (Sept. 26, 2025) (per curiam) ...............48, 49

*Doran v. Salem Inn, Inc.,*
    422 U.S. 922 (1975).........................................................................................60

*Fairfield Cnty. Med. Ass'n v. United Healthcare of New Eng.,*
    985 F. Supp. 2d 262 (D. Conn. 2013), *aff'd as modified sub nom.*
    *Fairfield Cnty. Med. Ass'n v. United Healthcare of New Eng.*, 557
    F. App'x 53 (2d Cir. 2014) ..............................................................................58

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992).........................................................................................50

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010).....................................................................41, 43, 50, 51

*Global Health Council v. Trump,*
    153 F.4th 1 (D.C. Cir. 2025) .....................................................................50, 54

*Global Health Council v. Trump,*
    2025 WL 2709437 (D.C. Cir. Aug. 28, 2025) .................................................50

*Halperin v. Kissinger,*
    606 F.2d 1192 (D.C. Cir. 1979).........................................................................4

*Hunt v. Washington State Apple Advert. Comm'n,*
    432 U.S. 333 (1977).....................................................................................33, 34

*INS v. Chadha,*
    462 U.S. 919 (1983)...............................................................................36, 37, 38

*J.G.G. v. Trump,*
    2025 WL 2317650 (D.C. Cir. Aug. 8, 2025) (per curiam)............................63

*Kendall v. United States,*
    37 U.S. (12 Pet.) 524 (1838) ..........................................................................50

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..................................................34, 56, 61

*Lucia v. SEC*,
585 U.S. 237 (2018) ..............................................................36, 37

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ....................................................................33

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ....................................................42

*Morrison v. Olson*,
487 U.S. 654 (1988) ......................................................................1

*Mote v. United States*,
110 F.4th 1345 (Fed. Cir. 2024) ................................................44

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983) ............................................................52

*Myers v. United States*,
272 U.S. 52 (1926) ......................................................................50

*National Inst. of Health v. American Public Health Ass'n*,
145 S. Ct. 2658 (2025) ............................................29, 46, 47, 48

*National Treasury Employees Union v. Vought*,
149 F.4th 762 (D.C. Cir. 2025) ....................................41, 50, 52, 53

*Nken v. Holder*,
556 U.S. 418 (2009) ..............................................................49, 61

*Perry Cap. LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017) ..............................................41, 42

*Raines v. Bird*,
521 U.S. 811 (1997) ....................................................................36

*Ryder v. United States*,
515 U.S. 177 (1995) ....................................................................36

*Sampson v. Murray*,
   415 U.S. 61 (1974)............................................................58

*Seila Law, LLC v. Consumer Fin. Prot. Bureau*,
   591 U.S. 197 (2020)..........................................................38

*Sergent's Mech. Sys., Inc. v. United States*,
   157 Fed. Cl. 41 (2021) ......................................................44

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994)...........................................41, 43, 44

*Train v. City of New York*,
   420 U.S. 35 (1975)............................................................55

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992)........................................6, 42

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
   665 F.3d 1339 (D.C. Cir. 2012)......................................55, 56

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
   559 F.2d 841 (D.C. Cir. 1977)...........................................59

*Webster v. Doe*,
   486 U.S. 592 (1988)..........................................................41

*Widakuswara v. Lake*,
   773 F. Supp. 3d 46 (S.D.N.Y. 2025) ...............................60

*Widakuswara v. Lake*,
   779 F. Supp. 3d 10 (D.D.C. 2025), *appeal pending* (D.C. Cir.),
   No. 25-5144....................................................................57

*Widakuswara v. Lake*,
   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025),
   *reconsideration en banc denied*, 2025 WL 1556440 (D.C. Cir.
   May 22, 2025), *and on reconsideration en banc*, 2025 WL
   1521355 (D.C. Cir. May 28, 2025) ...................................35

*Winter v. Natural Resources Defense Council*,
555 U.S. 7 (2008)...........................................................................49, 56

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)...................................................................37, 50, 55

## U.S. Constitution

U.S. Const., art. I, § 8, cl. 1 ......................................................51

U.S. Const., art. I, § 9, cl. 7 ......................................................51

U.S. Const. art. II, § 3 ...............................................................51

## Statutes

Administrative Procedure Act:
5. U.S.C. 706 ..........................................................20, 21, 51, 52, 54

Antideficiency Act:
31 U.S.C. §§ 1341-42, 1349-51, 1511-1519 ...................................54

Contract Disputes Act ............................ 3, 4, 5, 26, 27, 29, 39, 40, 41, 43, 44, 45
41 U.S.C. § 7102 ..................................................................40
41 U.S.C. § 7104 ..................................................................43
41 U.S.C. § 7105(e)(1)(D) ....................................................43
41 U.S.c. § 7105(e)(2) ..........................................................43

Consolidated Appropriations Act of 2024,
Pub. L. No. 118-42, 138 Stat. 95 ....................................................10

Consolidated Appropriations Act of 2023,
Pub. L. No. 117-328, 136 Stat. 4459, § 7063(b) ................................8

Consolidated Appropriations Act of 2022,
Pub. L. No. 117-103, 136 Stat. 49, § 7063(b) ....................................8

Consolidated Appriations Act of 2021,
Pub. L. No. 116-260, 134 Stat. 1182, § 7063(b) (2020)................................8, 9

Foreign Affairs Reform and Restructuring Act of 1998,
Pub. L. 105-277, codified at 22 U.S.C. § 6563 .................................................7

Foreign Assistance Act of 1961,
Pub. L. No. 87-195, 75 Stat. 424, codified at 22 U.S.C. Ch. 32 .................6, 7

Full Year Continuing Appropriations and Extensions Act of
2025, Pub. L. No. 119-4, 319 Stat. 9 ...................................................11, 16, 17

Further Consolidated Appropriations Act of 2024,
Pub. L. No. 118-47, 138 Stat. 460, § 7063(b) ...................................8, 9, 10, 11

Impoundment Control Act:
2 U.S.C. §§ 682-84 .................................................................................21, 48, 54

Tucker Act:
28 U.S.C. § 1491(a) ................................................................................41, 43, 44

5 U.S.C. § 104 ....................................................................................................... 7

22 U.S.C. § 6601 ................................................................................................7, 8

28 U.S.C. § 1292(a) .............................................................................................. 4

28 U.S.C. § 1331.................................................................. 4, 5, 28, 29, 39, 40, 46

## Regulations

2 C.F.R. § 700.1 ...................................................................................................13

41 C.F.R. § 105-53.132(b)......................................................................................45

48 C.F.R. § 37.104 ..........................................................................................11, 12

48 C.F.R. Ch. 7, App. D.......................................................................................12

48 C.F.R. § 1.602-1................................................................................................13

48 C.F.R. § 1.604 ..................................................................................................13

## Legislative Materials

170 Cong. Rec. H2090 (daily ed. March 22, 2024)............................................11

171 Cong. Rec. S1721 (March 12, 2025) ............................................................17

Roll Call Votes 119th Congress – 1st Session (2025), available at
    https://www.senate.gov/legislative/LIS/roll_call_lists/vot
    e_menu_119_1.htm ..........................................................................................17

## Executive Orders

*Administration of Foreign Assistance and Related Functions*, Exec.
    Order No. 10973, 26 Fed. Reg. 10,469 (Nov. 7, 1961) ....................................7

*Reevaluating and Realigning United States Foreign Aid*, Exec.
    Order No. 14169, 90 Fed. Reg. 8,619 (Jan. 20, 2025) ....................2, 13, 14, 52

## Other Sources

Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78
    Vand. L. Rev. 809 (2025)...................................................................................60

Drew DeSilver, *What the data says about federal workers* (Pew
    Research Center, Jan. 7, 2025), available at
    https://www.pewresearch.org/short-
    reads/2025/01/07/what-the-data-says-about-federal-
    workers/.............................................................................................................22

Atul Gawande, *The Shutdown of U.S.A.I.D. Has Already Killed
    Hundreds of Thousands*, The New Yorker (Nov. 5, 2025),
    available at https://www.newyorker.com/culture/the-
    new-yorker-documentary/the-shutdown ....................................................62

Cory R. Gill and Emily M. McCabe, Cong. Rsch. Serv. R40482,
    *Department of State Foreign Operations, and Related Programs
    Appropriations: A Guide to Component Accounts* 1 (July 28,
    2025), https://perma.cc/G956-FT4B .......................................................9, 10

Hana Kiros, *'In Three Months, Half of Them Will Be Dead,'* Atlantic (Apr. 16, 2025), available at https://perma.cc/B2J7-VR43; ......................62

Megan S. Lynch and James V. Saturno, Cong. Rsch. Serv. R47106, *The Appropriations Process: A Brief Overview* 1 (2023), https://perma.cc/RBC4-48M5; JA552 ........................................................12

Emily M. McCabe, Congr. Rsch. Serv. IF10261, *U.S. Agency for International Development: An Overview* (Sept. 5, 2025), https://perma.cc/T6X5-SBE6....................................................................9, 10

Elon Musk, X Spaces Conversation, available at https://x.com/DOGE/status/ 1886284966855647234 .............................14

Brooke Nichols and Eric Moakley, Impact Metrics Dashboard, impactcounter.com, available at https://perma.cc/4KJD-U3AD ..................................................................................................24, 62

James V. Saturno, Cong. Rsch. Serv. IF12105, *Introduction to Budget Authority* (May 13, 2022), https://perma.cc/D2MS-QPHN ...............................................................................................11

United States Court of Federal Claims, *Statistical Report of the U.S. Court of Federal Claims*, https://www.uscfc. uscourts.gov/sites/cfc/files/statistical_2024 .............................................45

C. Wright & A. Miller, 11A Fed. Prac. & Proc. § 2947 (3d ed. 2004) .................................................................................................58

## Rules

Fed. R. Civ. P. 42..................................................................................20

Fed. R. Civ. P. 65(a) .............................................................................59

D.C. District Court Local Rule 40.5(e)...................................................20

# GLOSSARY

CDA                    Contract Disputes Act, 41 U.S.C. §§ 7101–09

CFC                    Court of Federal Claims

ICA                    Impoundment Control Act, 2 U.S.C. § 681 *et seq.*

PSCA                   Personal Services Contractor Association

SFOPS                  Department of State, Foreign Operations and
                       Related Programs appropriations

## INTRODUCTION

This case presents a fundamental question about our constitutional order: the role of the judiciary when the Executive Branch defies Congress. Here, the Executive has not merely overreached. It has unilaterally dismantled a Congressionally created agency—USAID—and impounded billions in funds expressly appropriated to that agency.

These are clear separation-of-power violations. It is foundational that the power of the purse and the power to eliminate Congressionally created agencies belong to Congress. Our Constitution's divisions of power and responsibility are not parchment promises. They form our Constitution's most essential bulwark against despotism. As James Madison emphasized, allowing the accumulation of too much power in the same hands "may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 2003). Justice Scalia sounded the same warning just as starkly: "Without a secure structure of separated powers, our Bill of Rights would be worthless …." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

Defendants have done what Madison and Scalia feared. They have seized for themselves powers that the Constitution entrusts exclusively to Congress. They have upended Articles I and II and the structure the Framers deemed indispensable to liberty. On the first day of his second term, President Trump proclaimed that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests." *Reevaluating and Realigning United States Foreign Aid*, Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025). Implementing that view, the Defendants have eliminated USAID and impounded billions of dollars duly appropriated to that agency, touting the impoundment as "savings." The President's foreign affairs authority, substantial though it is, does not include the power to abolish a statutory agency or cancel appropriations. Those powers belong to Congress alone, and when the Executive seizes them, the edifice of liberty begins to crumble.

The district court declined to address these violations on the merits. Instead, it permitted Defendants to accelerate USAID's dismantling before judicial review could occur. In the process, it fundamentally misconstrued Plaintiff's claims—mischaracterizing them as disguised contract claims

rooted in "quintessentially personnel-related injuries"—and held that they belonged in the Court of Federal Claims or an agency review board under the Contract Disputes Act. That was error.

The plaintiff here—the Personal Services Contractor Association ("PSCA"), a voluntary association of USAID personal services contractors— does not bring a contract action and seeks no contract remedies. It seeks only declaratory and injunctive relief, which the Court of Federal Claims (CFC) and agency boards cannot provide. And it is pursuing claims for Defendants' violations of the Constitution and the Administrative Procedure Act that the CFC has no jurisdiction to hear and no ability to remedy. This case was filed exactly where it belongs: in federal district court, not an Article I tribunal or agency.

This appeal calls on the judiciary to fulfill the "province and duty" of Article III courts under *Marbury v. Madison*: to uphold the Constitution's separation of powers rather than stand on the sidelines while Defendants shatter those constitutional limits with breathtaking and unprecedented speed. Judicial deference to the political branches has its place, but not at the expense of the Constitution itself. As this Court has cautioned,

"[c]learly, a proper regard for separation of powers" demands vigilance, not abdication. Courts must not "meekly avert" their eyes from presidential excesses, for "such an abdication of the judicial role would sap the vitality of the constitutional rights whose protection is entrusted to the judiciary." *Halperin v. Kissinger*, 606 F.2d 1192, 1212 (D.C. Cir. 1979).

This Court should reverse. The district court's ruling rests on foundational legal errors—its flawed standing analysis, its crabbed view of its own jurisdiction, and its treatment of the Executive's asserted policy preferences as cognizable equities to be weighed against Congress's binding commands. Those errors cannot stand.

## JURISDICTIONAL STATEMENT

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. § 1331. JA217. The district court denied Plaintiff's motion for a preliminary injunction on July 25, 2025. JA853, 854-90. In its denial, the district court ruled that its jurisdiction was likely displaced by the Contract Disputes Act. JA873-79, 882-86. Plaintiff addresses that holding on pages 39-49 of this brief. Plaintiff filed a timely notice of appeal on August 13, 2025. JA891-92. This Court has jurisdiction under 28 U.S.C. § 1292(a).

# STATEMENT OF THE ISSUES

**I.   Standing.** Whether the district court erred in concluding that the PSCA likely has standing only to challenge its members' job losses, rather than the Executive Branch's dismantling of USAID, despite Defendants' admission that eliminating USAID and its workforce were a single initiative and despite the PSCA's independent organizational standing through harm to its mission.

**II.   Jurisdiction.** Whether the district court erred in concluding that the Contract Disputes Act likely divested it of jurisdiction under 28 U.S.C. § 1331, where the PSCA seeks no monetary relief and its claims neither arise from nor depend on any contract.

**III.   Likelihood of Success on the Merits.** Whether the PSCA is likely to prevail on its claims that Defendants acted arbitrarily, capriciously, and without statutory or constitutional authority in eliminating a Congressionally created agency and impounding billions of dollars in duly enacted foreign-aid appropriations.

**IV. Likelihood of Irreparable Harm.** Whether the district court applied the wrong legal standard in assessing the PSCA's evidence of likely irreparable harm.

**V. Balance of Equities and the Public Interest.** Whether the district court committed legal error by crediting the Executive's asserted policy preferences over its required compliance with Congress's explicit commands, failing to account for the substantial evidence of widespread harm from the destruction of USAID, and thus misapplying the balance-of-equities and public interest factors for preliminary injunctive relief.

## STANDARD OF REVIEW

In reviewing a district court's decision to deny a preliminary injunction, this Court decides questions of law de novo. *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 614 (D.C. Cir. 1992).

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

**A. Statutory and Regulatory Background**

**1. Foreign Assistance Act of 1961.** When Congress enacted the Foreign Assistance Act of 1961 (FAA), Pub. L. No. 87-195, 75 Stat. 424,

codified as amended at 22 U.S.C. § 2151 *et seq*., it "declare[d]" it to be the policy and "a principal objective" of the foreign policy of the United States "to assist people in developing countries to eliminate hunger, poverty, illness, and ignorance." And Congress established five enduring statutory priorities for foreign assistance, which remain the statutory priorities today: alleviating poverty; enabling self-sustaining economic growth; encouraging development processes that respect and enhance individual civil and economic rights; integrating developing countries in the international economic system; and promoting good governance. *Id.*

**2.   Foreign Affairs Reform and Restructuring Act of 1998 (Division G of Pub. L. 105-277, 22 U.S.C. § 6563).** To carry out the FAA, President Kennedy created the U.S. Agency for International Development (USAID). Exec. Order No. 10973, 26 Fed. Reg. 10,469 (Nov. 7, 1961). To safeguard its independence, Congress later codified USAID's status in the Foreign Affairs Reform and Restructuring Act of 1998, making it an "independent establishment" outside the State Department. 5 U.S.C. § 104; 22 U.S.C. § 6563(a). By statute, USAID's independent status cannot be altered—and the agency therefore cannot be dismantled—without prior Congressional approval. 22 U.S.C. § 6563(a); see also 22 U.S.C. § 6601 (authorizing the

President, for 60 days following USAID's codification under 22 U.S.C. § 6563(a), to propose eliminating the agency or reassigning its functions–authority that expired on December 30, 1998 with no such action).

   **3.   SFOPS Section 7063(b).** Congress has further underscored USAID's independence by repeatedly including language in successive annual Department of State, Foreign Operations and Related Programs (SFOPS) appropriations acts stipulating that, without prior notification and consultation with appropriate Congressional committees, no funds appropriated by "any" Act may be used to:

   (1)   *expand, eliminate, consolidate, or downsize* covered departments, agencies, or organizations [including USAID] … *including the transfer to other agencies* of the authorities and responsibilities of such bureaus and offices;

   (2)   expand, eliminate, consolidate, or downsize the United States official presence overseas ….; or

   (3)   expand *or reduce the size of the ... workforce of … USAID* from the staffing levels previously justified to the Committees on Appropriations ….

*Further Consolidated Appropriations Act of 2024*, Pub. L. No. 118-47, 138 Stat. 460 (2024) ("FCAA 2024"), § 7063(b) (emphasis added). See also Pub. L. No. 117-328, 136 Stat. 4459, § 7063(b) (2022) (same); Pub. L. No. 117-103, 136 Stat. 49, § 7063(b) (2022) (same); Pub. L. No. 116-260, 134 Stat. 1182,

§ 7063(b) (2020) (same). See also Pub. L. No. 119-14, 139 Stat. 10, § 1105 (2025) (carrying forward the conditions imposed by § 7063(b) of Pub. L. No. 118-47 (2024)). These limits on Executive authority to expand, eliminate, downsize, or consolidate USAID are binding law.

**4.    SFOPS appropriations.** Each year, Congress appropriates billions of dollars of funds to USAID, which the agency uses to administer health, nutrition, disaster assistance, and other lifesaving programs to countries and people in need, as well as promoting democracy and economic development internationally, thus fulfilling the statutory priorities Congress established in the FAA. FCAA 2024, div. f, tit. II-III, 138 Stat. 460, 740, 742, 771–72. See also *Full Year Continuing Appropriations and Extensions Act*, 2025, P.L. 119-14, div. f, tit. I and XII, 139 Stat. 9, 10-15, 36-38; Emily M. McCabe, Cong. Rsch. Serv., IF10261, *U.S. Agency for International Development: An Overview* (Sept. 5, 2025), https://perma.cc/T6X5-SBE6. See also JA269, 283, 289-93, 302-306, 311, 315-20, 672, 807-08. Congress includes these appropriations primarily as SFOPS appropriations, which it enacts as Division F of larger consolidated appropriations laws. See JA610-18, 627-31, 647, 651-52, 660-62; Cory R. Gill and Emily M. McCabe, Cong. Rsch. Serv.

R40482, *Department of State Foreign Operations, and Related Programs Appropriations: A Guide to Component Accounts* 1 (July 28, 2025), https://perma.cc/G956-FT4B.

**5.** For FY 2024 (the most recent year for which complete data is available), USAID managed more than $35 billion in combined appropriations, including $4 billion for global health programs and $4.8 billion for international disaster assistance, which "shall be apportioned directly to the United States Agency for International Development" and "shall" be made available "in the amounts specifically designated," subject only to "authorized deviations" not to exceed 10 percent. FCAA 2024, 138 Stat. 460, 740, 742, 771–72. See also McCabe, *supra,* IF10261. USAID also administers more than $1.5 billion in annual appropriations for Food for Peace and other food aid, funded by Agriculture appropriations. See Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. b, tit. V, 138 Stat. 95 (2024); JA584-89, 592-93. See also Emily M. Morgenstern and Nick M. Brown, Cong. Rsrch. Serv. R40213, *Foreign Assistance: An Introduction to U.S. Programs and Policy* (Jan. 10, 2022) (JA793-830).

**6.** In its FY2024 appropriations for global health funding, Congress was very specific, dictating how much must be spent to combat which

diseases. 170 Cong. Rec. H2090 (daily ed. Mar. 22, 2024). For development

assistance funding, Congress mandated precise amounts to be used in

designated locations. *Id.* Congress often provides these appropriations on a

multiyear basis, which means they "remain available" after the fiscal year

for which they were appropriated or, in the case of no-year appropriations,

indefinitely. See FCAA 2024 ($4.8 billion in international assistance "to

remain available until expended"); Pub. L. 119-4, §§ 1101(a)(11), 1102–03,

1113(c)(12), 139 Stat. 9, 10, 12, 14 (2025) (providing that appropriations that

carried a multiple-year or indefinite period of availability in FY 2024

appropriations acts "shall [continue to] retain a comparable period of

availability"). See generally, James V. Saturno, Cong. Rsch. Serv. IF12105,

*Introduction to Budget Authority* (May 13, 2022), https://perma.cc/D2MS-

QPHN ("Budget authority may be made available for obligation for a one-

year, multiyear, or no-year period …. No-year budget authority is typically

identified by language indicating that it is "to remain available until

expended.")

    **7.**   **Personal Services Contractors, 48 C.F.R. § 37.104.** The Plaintiff in

this case—the USAID Personal Services Contractor Association ("the

PSCA")—is a voluntary association of USAID employees who are or have

been hired as personal services contractors (PSCs). JA399-400. They are "employees" under federal law. 48 C.F.R. § 37.104; JA121-24, 429-30. Under USAID's Acquisition Regulations (AIDAR), U.S. citizen personal services contractors "may be delegated or assigned any authority, duty, or responsibility delegable to U.S. citizen direct-hire employees," 48 C.F.R. Ch. 7, App. D. PSCs are not protected by civil service or foreign service laws, are not unionized, and therefore cannot access the dispute-resolution processes of the Merit Systems Protection Board, the Foreign Service Grievance Board, the Foreign Service Labor Relations Board, or the Federal Labor Relations Board. JA122-25, 430.

## B.  Factual Background

**8.  What PSCs do.** From its inception, USAID carried out its foreign assistance mission in partnership with "implementing partners," to which the agency obligates appropriated funds through grants, contracts, and cooperative agreements. See Megan S. Lynch and James V. Saturno, Cong. Rsch. Serv. R47106, *The Appropriations Process: A Brief Overview* 1 (2023), https://perma.cc/RBC4-48M5; JA554, 556-72. PSCs perform nearly all the same duties as direct hires, including "inherently governmental functions." JA122-25, 429, 779. They are central to USAID's operations, including

serving as warranted contracting and agreement officers, 48 C.F.R. § 1.602-1; 2 C.F.R. § 700.1, and contracting and agreement officer's representatives. 48 C.F.R. § 1.604; JA61, 64, 74, 78, 96, 111, 115, 425, 519-20. PSCs provide critical oversight of the awards issued to USAID's implementing partners. JA59-61, 64-65, 74-75, 78-82, 84-88, 96, 111-12, 115-19, 462-63, 512, 519-20.

**9.** As of January 19, 2025, USAID employed approximately 1,200 PSCs, almost half of them posted at USAID's overseas missions. JA174, 400. PSCs made up more than half of the staff of USAID's Bureau for Humanitarian Assistance, which oversaw aid that includes food, water, shelter, emergency healthcare, sanitation and hygiene, and critical nutrition services. JA773-74. PSCs also constituted a large majority of the staff of USAID's Office of Transition Initiatives, which promoted peace and democracy, including in countries transitioning from authoritarianism to democracy or from violence to peace. *Id*. Many PSCs had long tenures, even decade(s)-long careers, as USAID employees across many bureaus. JA32-33, 50, 104, 107, 115, 117, 133.

**10. Executive Order 14169 and its immediate aftermath.** On the first day of his second term, President Trump signed an Executive Order titled *Reevaluating and Realigning United States Foreign Aid*, proclaiming that "[t]he

United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values" and "pausing" all United States foreign development assistance. Exec. Order No. 14169, 90 Fed. Reg. 8,619 (Jan. 20, 2025) (JA148-49). Four days later, the Secretary of State issued a communique implementing the President's Executive Order. JA151-55, 552. All USAID programs were immediately suspended and stop-work orders issued to implementing partners worldwide. JA340, 508, 526-30, 533, 716-17. New obligations were barred. JA552, 716-17. The "Department of Government Efficiency" (DOGE) shut down USAID's payment system (known as Phoenix). JA376, 533-36, 539. Implementing partners were not paid for work already performed. JA61-62, 66, 112, 376-78, 533-36. DOGE also shut down USAID's website and its X and Instagram accounts. JA490, 697, 761.

**11. Shutting down USAID.** On February 2, 2025, during an X Spaces Conversation with Vivek Ramswamy and Sen. Joni Ernst (R-Iowa), Elon Musk—then directing DOGE—hosted the "First DOGE X Spaces Conversation" and, describing USAID, said: "I went, went over it with [the President], you know, in detail, and he agreed … we should shut it down."

"And I actually checked with him a few times [and] said 'are you sure?'

And he confirmed it." Musk also added that:

> So to be clear, in shutting down, which we're in the process of
> doing, shutting down USAID, the reason for that, as opposed to
> simply trying to do some minor housecleaning, is that, as we
> dug into USAID, it became apparent that what we have here is
> not an apple with a worm in it, but we have actually just a ball
> of worms . . . If you've got an apple that's got a worm in it,
> maybe you can take the worm out, but if you've got actually just
> a ball of worms, it's hopeless. And USAID is a ball of worms.
> There is no apple. And when there is no apple, you've just got to
> basically get rid of the whole thing . . . That is why it's got to go,
> it's beyond repair.

JA749, 752-53, 758-59, recording available at https://x.com/DOGE/status/

1886284966855647234? lang=en. See also JA747 (Musk's additional

statements that "USAID is a criminal organization" and "Time for it to

die").

   **12.**    On February 3, 2025, Musk posted on X, "We spent the weekend

feeding USAID into the wood chipper," to which Representative Marjorie

Taylor Greene (R-GA) replied, "I hope USAID is completely eliminated

because Congress would never get rid of it on their own." JA764-65. On

February 2 and 3, 2025, DOGE closed USAID headquarters at the Ronald

Reagan Building (RRB), placed over 1400 direct-hire personnel on leave,

and locked almost the entire USAID workforce (direct-hire employees and PSCs) out of USAID computer systems, including critical security communications tools protecting overseas employees and their families. JA69-70, 405, 502, 516, 520, 543-4, 548-49, 700. On February 4, employees were notified in an email with the subject line "The Path Forward" that all direct hire personnel would be placed on leave globally on February 7 and nonessential PSCs would be terminated. JA705. See also JA502-03. On February 7, Defendants canceled USAID's leases, removed identifying signage, and turned USAID's RRB headquarters over to Customs and Border Patrol. JA690, 693-94, 719, 721, 767. On February 19, one day after the PSCA filed its complaint, JA1, 10, Defendants began notifying most PSCs that they were being terminated. JA35-37, 40-41, 174, 515-16, 709, 712, 714. The PSCA filed for a TRO immediately to address those harms to its members. JA1, 28-31.

**13. Continued Funding.** On March 14 and 15, 2025, Congress passed and President Trump signed Public Law 119-4, a continuing resolution (CR) that continued funding the federal government through September 30, 2025 at FY 2024 levels. Pub. L. No. 119-4 §§ 1101–06, 139 Stat. 9, 10–12

(March 15, 2025); JA606-08. During the consideration of that CR, Senator Rand Paul (R-KY) proposed cutting certain USAID accounts by 83% compared to their FY2024 enacted levels—including international disaster assistance and global health programs. That amendment was rejected on a bipartisan vote, 27-73. Senate.gov record of Roll Call Votes for the 119th Congress-1st Session, available at https://perma.cc/34JV-8VHA; 171 Cong. Rec. S1721 (Mar. 14, 2025) (SA 1266).

14. **Continued Destruction of USAID.** Notwithstanding the March 2025 Continuing Resolution, on March 24, 2025, almost two months after the Administration began shuttering USAID, the Trump Administration sent an "update" to Congress, JA241-44, that, among other things: (a) it had terminated 5,341 USAID awards, representing "savings" of $27.7 billion; (b) it had reduced direct hire USAID employees on active duty from 4,717 to 869; and (c) there remained more than $35 billion in funds appropriated to USAID, including more than $8 billion in unobligated funds and more than $27 billion in newly unobligated funds attributable to terminated awards. JA241. Defendants took these actions without giving Congress prior notice. JA725-45.

**15.  USAID'S "Final Mission."** On March 28, 2025, the Administration announced to Congress that "substantially all USAID personnel will be separated from federal service," "discontinuing" most USAID functions and merging the remnants into the State Department. JA246. The same day, Jeremy Lewin, a DOGE staffer installed at USAID, sent an email to all USAID personnel with the subject line "USAID's Final Mission," announcing that: (a) USAID would not "continue operating as an independent establishment"; (b) "[a]s part of that process, substantially all nonstatutory positions at USAID will be eliminated …. Within the next few minutes, USAID personnel will begin receiving RIF notices …. These notices will specify one of two final separation dates: July 1, 2025, or Sept. 2, 2025"; (c) "The remaining USAID personnel will then supervise the … decommissioning of USAID assets and the wind-down of the Agency's operations"; (d) "By July 1, 2025, the State Department will have assumed responsibility for USAID's remaining programming"; and (e) "By September 2, 2025, the Agency's operations will have been substantially transferred to State or otherwise wound down." JA259-63. See also JA436, 447-50. At the same time, USAID began terminating the entire workforce, including PSCs whose prior terminations had been put on hold. JA265-66,

445-46, 456-58. In early April 2025, Marcus Thornton, then USAID's Deputy Chief of Staff, told USAID mission directors that:

- Congressional earmarks for programs would not be honored.

- State Department officials have said that:

    o "Come hell or high water, USAID will be integrated fully into State by July"

    o "Litigation is over; just get on with it"

    o "USAID will be a test case for the State RIF to follow"

JA475.

## C. Procedural Background

**16.** *AFSA/AFGE v. Trump.* On February 6, 2025, the American Foreign Service Association (AFSA) and the American Federation of Government Employees (AFGE) filed suit in the district court challenging Defendants' efforts to destroy USAID. Case No. 1:25-cv-352-CJN (D.D.C.). OxFam later joined as an additional plaintiff. *Id.*, ECF 30.

**17.** *PSCA v. Trump.* Twelve days later, the PSCA filed its own suit, likewise challenging Defendants' destruction of USAID. Case No. 1:25-cv-469-CJN (D.D.C.). JA1, 10. Pursuant to Local Rule 40.5(e), the Calendar and Case Management Committee assigned the PSCA's suit to Judge Carl

Nichols, who was already presiding over the AFSA/AFGE suit. The cases were not consolidated. Fed. R. Civ. P. 42.

**18.  The PSCA's claims.** In its initial complaint, the PSCA asserted constitutional claims—for violations of the separation of powers and the Take Care Clause—and Administrative Procedure Act (APA) claims. JA22-25. At almost the same time, the PSCA moved for a temporary restraining order focused on immediate harms being experienced by PSCs, which the district court denied. JA1, 4, 28-30, 908-09. In April 2025, after the Defendants' March announcements that USAID was being shuttered, the PSCA filed an amended complaint adding defendants and a non-statutory ultra vires claim. JA6, 214-36. The amended complaint set out five claims:

(a)  **A non-statutory review claim for equitable relief against the President under Article II of the Constitution** for his violation of the separation of powers—because Congress, not the President, directs how federal funds must be spent and because only Congress, not the Executive unilaterally, can shutter a Congressionally created agency (USAID). JA231.

(b)  **A non-statutory review claim for equitable relief against the President under Article II** for his failing to "take Care" that the laws be

faithfully executed—by flouting Congress's establishment and funding of
USAID. JA232.

(c) **An Administrative Procedure Act (APA) claim,** 5 U.S.C.
§ 706(2)(A), against all Defendants except President Trump for final agency
action that was "arbitrary, capricious, [or] an abuse of discretion"—because
their stated justifications are wildly disproportionate to their decision to
shutter USAID and because, before shuttering USAID, they failed to
consider alternatives and the serious reliance interests generated by
decades of bipartisan foreign assistance policy. JA232-33.

(d) **An APA claim,** 5 U.S.C. § 706(2)(A), against all Defendants except
President Trump for final agency action "not in accordance with law"—
because their challenged actions have violated the APA, Congressional
appropriations statutes, the Impoundment Control Act ("ICA"), and the
Antideficiency Act. JA233.

(e) **An ultra vires claim** against all Defendants to enjoin and declare
unlawful their dissolution of a Congressionally created agency and

impoundment of duly enacted appropriations with no Congressional

authorization and no constitutional warrant, express or implied. JA234.

**19. The PSCA's Request for a Preliminary Injunction.** Shortly after

filing its amended complaint, the PSCA moved for a preliminary injunction

seeking exclusively nonmonetary relief aimed at saving USAID and its

appropriated funding. JA6, 237-38. In support of its motion, Plaintiff

submitted evidence—unrebutted in the district court—describing the scope

and pace of the agency's dismantling. JA241-66, 272-77, 332-37, 340-42, 436-

58, 475-82, 508-13, 690-97, 705-14, 723, 741, 747, 764-67. The PSCA's

undisputed evidence also reflected that USAID was an operationally

complex agency with a global footprint, staffed by highly trained

specialists in fields such as engineering, firefighting, infectious diseases,

logistics, and supply chain management—many of them required to

deploy on short notice to war zones and disaster areas. JA38, 43, 270-277,

281-88, 296-301, 309-14, 324-25, 515, 777-78. See also Drew DeSilver, *What

the data says about federal workers* (Pew Research Center Jan. 7, 2025)

https://www.pewresearch.org/short-reads/2025/01/07/what-the-data-

says-about-federal-workers/ ("The most highly educated federal agency,

among those with at least 1,000 employees, *isn't NASA or the National Science Foundation, but the U.S. Agency for International Development*") (emphasis added).

**20.** The PSCA also presented undisputed evidence concerning USAID's extensive network of implementing partners, built over decades and essential to the agency's ability to deliver lifesaving assistance in some of the most unstable regions of the world. JA270-77, 554, 556, 558-60, 562-72, 821. At the time the PSCA filed for preliminary relief, Defendants had issued RIF notices and termination letters to the almost entire USAID workforce, including almost all PSCs. JA 260-67, 445-46. Hundreds of PSCs stationed overseas had no housing, schools, health insurance, or jobs to return to in the United States. JA52-56, 445-46, 447-50, 456-68, 475-79. See also JA104-05.

**21.** The PSCA further submitted evidence that Defendants' termination of USAID awards and impoundment of billions in appropriated USAID funds were causing implementing partners to lay off staff, curtail operations, or face insolvency. JA276, 372, 440, 446, 468, 494, 526, 536. Additional undisputed evidence described the consequences of the agency's shutdown, including estimates of 100 deaths every hour from

hunger and disease that would have been prevented and the likelihood of

millions more preventable deaths. JA346-60, 389-90; Brooke Nichols and

Eric Moakley, Impact Metrics Dashboard, https:// www.impactcounter.

com /dashboard (as of Apr. 20, 2025) (sorted for Funding Source

"USAID").

**22.** The PSCA's preliminary injunction motion principally sought to

enjoin Defendants from:

(a)     Continuing to suspend, eliminate, consolidate, reorganize, or
        downsize USAID;

(b)     Transferring, integrating, or subsuming USAID into other parts
        of the federal government;

(c)     Refusing to apportion to USAID the full funding Congress had
        appropriated to USAID;

(d)     Destroying or removing public online access to apportionment
        data;

and to require Defendants to:

(e)     Develop and file a plan showing how they would timely obligate
        Congressionally appropriated funds, maintain staffing at USAID
        at levels adequate to carry out statutorily mandated activities;
        and

(f)     Refrain from giving effect to termination notices sent to PSCs,
        and reinstate them, until complying with paragraph (e) above.

JA237-38.

**23.** **The District Court's Ruling.** On July 25, 2025, the district court denied the PSCA's motion for a preliminary injunction, giving rise to this appeal. JA853, 854-90. At the same time, for overlapping reasons and in a single memorandum opinion, the district court also denied AFSA/ AFGE/Oxfam's then pending motion for summary judgment, and it granted Defendants' motion to dismiss the AFSA/AFGE/Oxfam case. AFSA, AFGE, and Oxfam have filed their own appeal, also now pending in this Court. *AFSA et al. v. Trump*, No. 25-5290.

**24.** As to the PSCA, the district court made several rulings in its July 25 opinion that give rise to this appeal. *First*, the district declined to "analyze this case as if there were … one, expansive agency action—the dismantling of USAID—from which [the PSCA] seek[s] relief." JA865. Instead, it divided the PSCA's claims into two buckets—"discrete personnel actions" affecting the "employment or contract status" of PSCA members, on the one hand, and "the wholesale 'shutdown of the agency'" on the other— and held that the PSCA had concrete and particularized injuries flowing from, and therefore standing to challenge, only the former and not the latter. JA868-69.

*Second*, having held that the PSCA had standing to challenge only "personnel" actions, the district court then held that the PSCA's surviving claims were, at bottom, contractual and thus likely subject to the Contract Disputes Act (CDA) and within the jurisdiction of the Court of Federal Claims (CFC) (or an agency contract disputes board), but not a district court. JA874-79, 882-86. In reaching that conclusion, the district court rejected the PSCA's arguments that its claims: (a) were not contractual—neither alleging a breach nor invoking any contract terms or conditions; (b) challenged Executive usurpations of legislative authority that Congress never intended to channel to Article I tribunals (such as the CFC or an agency board); and (c) requested exclusively equitable relief that the CFC cannot grant. JA882-86.

*Third*, turning to the remaining factors for preliminary relief, the district court held that the PSCA had not shown irreparable harm. The court noted that, "whatever the validity" of concerns about harms to USAID, its "institutional capacity," its infrastructure, and "its workforce, systems, and global partnerships"—and even if none of those could "easily be restored"—they "are not concerns about the irreparable harm to the

PSCA or its members specifically." JA888. As for the balance of equities and the public interest, the court found it "difficult to weigh" the "plausible interests on either side" of the ledger, including Defendants' asserted interests in "aligning" foreign aid with "American values" and "maintaining control over personnel matters." JA889. But, the court concluded, "where the PSCA has not demonstrated an irremediable injury and where Congress meanwhile has limited the resolution of … potentially costly personnel claims" to the Court of Federal Claims, neither the equities nor the public interest favored a preliminary injunction. JA890 (cleaned up).

## SUMMARY OF ARGUMENT

This case presents a fundamental question about our constitutional structure, and it belonged in an Article III court. The PSCA challenges the Executive Branch's unprecedented actions to dismantle a Congressionally created agency and nullify billions in duly enacted appropriations—actions that trench directly on Congress's exclusive powers to create offices and control the purse. Yet the district court concluded that the PSCA likely had standing only to challenge personnel-related decisions and that, as a result, the Contract Disputes Act silently displaced its federal question jurisdiction

under 28 U.S.C. § 1331. Those conclusions misconstrued the PSCA's claims, and they are irreconcilable with the plain text of the CDA and § 1331, with this Court's and the Supreme Court's precedents, and with the Constitution's basic structure.

First, the PSCA has standing—both associational and organizational—and its standing is straightforward. The PSCA and its members have suffered concrete injuries-in-fact directly traceable to the dismantling of USAID and the impoundment of its funding; and a favorable judgment would redress those injuries by reconstituting USAID and restoring its funding, returning at least some PSCA members to their jobs and preserving the PSCA's existence and ability to function. The district court's contrary, crabbed view of standing relied on an untenable, invented distinction between "personnel actions" and "shutting down" USAID—when factually, analytically, and by Defendants' own admission employee terminations were part and parcel of eliminating the agency. There was no separate "personnel" action; eliminating jobs and eliminating USAID were the same initiative.

Second, § 1331 jurisdiction is equally straightforward. The CDA is a narrow regime crafted for resolving disputes about certain government contracts. For decades, this Court has emphasized that the CDA does not channel claims grounded in the Constitution or federal statutes—as the PSCA's are—rather than in contract. Nor does it channel claims seeking the prospective equitable relief the PSCA seeks, as opposed to money damages. The Supreme Court's recent order in *NIH v. APHA* underscores the point. As Justice Barrett's controlling concurrence makes clear, district courts retain § 1331 jurisdiction over APA challenges to agency policy decisions distinct from monetary claims. The PSCA's challenge to the Executive's policy decision to dismantle USAID claims falls squarely within that lane. By treating the CDA as an implied repeal of § 1331 in these circumstances, the district court misread both statutes and would consign core separation-of-powers disputes to a tribunal Congress did not design to decide them.

Third, the PSCA is overwhelmingly likely to succeed on the merits. Only Congress—not the Executive—has the constitutional authority to eliminate Congressionally created agencies and to decide how

appropriated funds must be spent. The Executive's effort to dismantle USAID and impound billions in foreign aid appropriations lacks any statutory or constitutional warrant. Its actions also violate the APA: they are arbitrary and capricious, unmoored from any rational justification, contrary to binding appropriations law and the Constitution, and dismissive of profound reliance interests created by decades of bipartisan foreign-assistance policy. Ultra vires conduct on this scale cannot stand.

Fourth, the district court's mistreatment of irreparable harm both applied the wrong legal standard and failed to grasp the nature of the harm to the PSCA and its members. It overlooked the central point: the PSCA sought interim relief to prevent the Executive from shuttering USAID—by eliminating its workforce, decommissioning its assets, dismantling its systems, and terminating its global operations—before any court could adjudicate the legality of those actions. In circumstances like these—where a business or a federal agency is being dismantled piece by piece—withholding preliminary relief rewards the party intent on destruction, allowing it to race ahead to make the destruction a fait accompli while motion practice or discovery proceed. One of the most

important purposes of a preliminary injunction is to preserve the court's remedial options. No later relief can "flip a switch" to turn USAID back on.

Fifth, turning to the balance of equities and the public interest, the district court erred by treating the President's defiance of Congress as weighing in his favor. But there is no public interest in the continuation of unlawful Executive action, and a profound one in ensuring the Executive's compliance with Congress's binding commands. Congress has mandated—with unmistakable clarity—that USAID is an independent establishment that only Congress can abolish and that appropriated dollars "shall" be made available to USAID "in the amounts specifically designated," for precise, legally binding purposes. As a matter of law, the President has no cognizable interest in defying that mandate. And the district court compounded this error by ignoring the unrebutted evidence of catastrophic public harms. Shuttering USAID has already produced mass hunger, preventable disease, and death on a staggering scale. Hundreds of thousands have died of hunger and disease and in war zones and natural disaster areas. They cannot be revived. Children born HIV-positive cannot be uninfected. Shortages of critical medications, food, and other supplies

cannot be reversed by an order issued next week, next month, or next year. The PSCA submitted substantial evidence of this devastation; the Government did not contest it. See, e.g., JA274-76, 346-65, 389-90, 494-96. The district court ignored it.

The district court's denial of preliminary injunctive relief should be reversed. At the same time, this case should be remanded for further development of the factual record, followed by renewed consideration of injunctive relief, because the destruction of USAID has continued during the pendency of this appeal, and the resulting harms have only grown. Vacatur and remand are often proper when material events unfold while a case is on appeal, affecting the circumstances of injunctive relief. Accordingly, this Court should correct the district court's legal errors and direct the district court to reassess injunctive relief in light of the changed conditions, on a properly developed record.

## ARGUMENT

## I. The district court erred in confining the PSCA's likely standing to claims challenging the termination of its members' employment.

The district court collapsed this case into a far narrower dispute than it actually presents. Although it recognized that the PSCA, as the master of

its pleadings, was "challenging the 'wholesale dissolution of USAID,'"

JA865, it nonetheless held that the PSCA's standing was limited to

challenging "personnel" actions because it had not alleged that it had

"injuries flowing from those [*non*-personnel] actions specifically." JA868.

That was error.

First, the PSCA plainly has Article III standing to challenge the

shuttering of USAID, not just specific job losses. *Hunt v. Wash. State Apple

Advert. Comm'n,* 432 U.S. 333, 343 (1977) (elements of associational

standing); see also *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)

(elements of Article III standing generally). Its members would have

standing in their own right. *Hunt*, 432 U.S. at 342-43. They lost their jobs,

giving them injury-in-fact "fairly traceable" to the Defendants' dismantling

of the agency and impoundment of funding. *Lujan*, 504 U.S. at 560-61. A

court order declaring those actions void and directing that USAID be

reconstituted and its funding restored would redress the PSCA's members'

injuries by likely returning at least some of them to their positions. *Id.* The

members' interests are germane to the organization's purpose, *Hunt*, 432

U.S. at 343, which is to vindicate the rights and interests of its members,

JA400, and the injunctive and declaratory relief the PSCA seeks does not require its members' individual participation. *Hunt*, 432 U.S. at 343. Article III requires nothing more. Neither should this Court.

Second, the PSCA also has organizational standing: Defendants' actions have threatened not just its mission but its very existence. JA401-02; see also *League of Women Voters of U.S. v. Newby* ("*Newby*"), 838 F.3d 1, 9 (D.C. Cir. 2016).

Third, the district court misunderstood the gravamen of this case. The court artificially parsed the Executive's conduct into "discrete personnel actions," on the one hand, which the PSCA has standing to challenge, and "*non*-personnel" actions on the other—as if the two were analytically or practically separable. JA868. They are not. The PSCA challenges the Executive's unconstitutional, unilateral, and undisputed dismantling of a Congressionally created agency—of which employee terminations were an essential feature, as Defendants themselves acknowledged. Jeremy Lewin's March 28, 2025 "Final Mission" memo to all USAID personnel eliminated all doubt: Defendants were "retir]ing] USAID's independent operation"; the agency would cease "operating as an independent establishment"; and

"*[a]s part of that process*," substantially "all non-statutory positions at USAID will be eliminated." JA260 (emphasis added). By Defendants' own account, dismantling the agency and eliminating gutting the workforce ("personnel" actions) were one and the same initiative.

The district court's contrary conclusion—collapsing this case into a narrow dispute about "discrete personnel actions," JA868—flowed in part from its misreading of a portion of a motion-panel order in *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at * 3 (D.C. Cir. May 3, 2025), which states that, for purposes of the APA, the "dismantling" alleged in that case was "a collection of many individual actions" rather than discrete agency action. JA865. The district court apparently misunderstood and misapplied that observation as an Article III standing rule, which it is not. It is a comment about the scope of APA review. JA865, 876-79. That was legal error.

Fourth, the district court wrongly discounted the indispensable role that private litigation has long played in enforcing the Constitution's structural safeguards of liberty. Private litigants have long been "the principal source" of justiciable separation-of-powers claims. *Bond v. United*

*States*, 564 U.S. 211, 212 (2011). Indeed, because *Raines v. Bird,* 521 U.S. 811 (1997), foreclosed standing for individual members of Congress to claim institutional injury, private plaintiffs are not only permissible but indispensable enforcers of constitutional structure.

The Supreme Court has repeatedly—and recently—confirmed the broad standing for plaintiffs to vindicate separation-of-powers principles, precisely because those principles are "designed to preserve the liberty of all the people." *Collins v. Yellen*, 594 U.S. 220, 245 (2021). As a result, "whenever" a separation-of-powers violation occurs, "any" aggrieved party with an injury-in-fact traceable to the violation and redressable by a favorable judgment may sue to restrain the usurping branch. *Collins,* 549 U.S. at 245; *INS v. Chadha*, 462 U.S. 919, 935–36 (1983).[1] Indeed, the Supreme Court has taken care to "create incentives" for private parties to enforce the Constitution's separation-of-powers principles. *Lucia v. SEC,* 585 U.S. 237,

---

[1] See also *Bond*, 454 U.S. at 222 (referring to individuals as "intended beneficiaries" of the Constitution's structural provisions in the "analogous context" of federalism principles).

252 n.5 (2018) (Appointments Clause); *Ryder v. United States*, 515 U.S. 177, 183 (1995) (same).

Time and again, in a variety of contexts and with respect to a variety of types of Executive action, private litigants have done exactly that. In *Clinton v. City of New York*, 524 U.S. 417, 425 & n.9 (1998), the Supreme Court invalidated the President's line-item veto at the behest of a potato farmers' cooperative and the City of New York. In *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585–89 (1952), the Court sustained a private steel company's challenge to the President's unilateral seizure of its plants. In *Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984), this Court allowed workers to bring a separation-of-powers challenge to a reduction in force carried out by officials "constitutionally disqualified from exercising power over them." 729 F.2d at 1495. As in each of those cases, so too here: when the Executive displaces Congress by arrogating legislative power to itself, judicial intervention is both proper and necessary to restore the constitutional balance.

The district court compounded its error, first by ignoring *Collins v. Yellen,* and then by resorting to formalistic distinctions to try to distinguish

additional controlling contrary separation-of-powers precedent—including *Andrade; Chadha*; and *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020)—as cases in which plaintiffs had "sought (and won) the cessation, on constitutional grounds, of specific government actions against them, which unquestionably redressed their particular injuries." JA868-69. That distinction—if any—is formalistic at best.

In *Andrade*, as here, employees successfully challenged actions taken by officials lacking constitutional authority (in *Andrade*, the House's unilateral attempt to override the Executive). In *Seila Law*, a law firm successfully challenged a civil investigative demand issued by an allegedly unconstitutionally structured agency. See also *Axon Enterpr., Inc. v. Federal Trade Comm'n,* 598 U.S. 175 (2023) (corporation and certified public accountant challenging the FTC's constitutional authority to initiate proceedings against them). In each case, the plaintiff was an aggrieved party seeking to restrain a usurping branch, and a favorable judgment would redress its injury.

The same is true here: the PSCA alleges injury-in-fact traceable to actions by governmental officials constitutionally disqualified from taking

them. And a court order stopping those illegal actions would likely redress those injuries by restoring USAID's functioning and thus returning at least some PSCs to their jobs.

## II.   The district court also erred by concluding that the Contract Disputes Act likely divested it of jurisdiction.

Under 28 U.S.C. § 1331, federal district courts have jurisdiction over "all" civil actions arising under the Constitution and the laws of the United States. This is such an action. The PSCA challenges Defendants' usurpation of powers that Article I entrusts exclusively to Congress—dismantling USAID and impounding duly appropriated funds—and asserts constitutional, statutory, and ultra vires claims that fall squarely within the heartland of every federal district court's federal question and equitable jurisdiction. These are precisely the kinds of claims that Article III courts are empowered, and indeed have a "virtually unflagging obligation," to decide. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

Yet relying on its misguided view that the PSCA could challenge only personnel-related harms, the district court concluded that this case was governed by the CDA. The PSCA's claims are significantly broader than

complaints about its members' contracts. Under any construction of the PSCA's claims, the CDA does not apply. The district court's contrary conclusion was error.

### A. The Contract Disputes Act does not strip the district court of jurisdiction over the PSCA's claims.

Despite § 1331's clear grant of jurisdiction, the district court reasoned that the PSCA's members "have CDA-covered [employment] contracts," that "it appears likely" their claims "are at bottom contractual ones," and that the Contract Disputes Act therefore "pre-empts whatever jurisdiction" a district court might otherwise have. JA874-75 (cleaned up). That gets both the Contract Disputes Act and the structure of judicial review backward.

First, nothing in the text of the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101–09, displaces district court jurisdiction here. The CDA's text refers only to *contracts*, 41 U.S.C. § 7102, which the PSCA's constitutional, statutory, and ultra vires claims do not implicate. The CDA contains no express jurisdiction-stripping language applicable to the PSCA's claims constitutional, statutory, and ultra vires claims. Nor can the CDA impliedly repeal § 1331 jurisdiction, which "'in particular 'should hold firm against mere implication[s]' from other laws." *Axon*, 598 U.S. at 208 (Gorsuch, J.,

concurring) (quoting *Mims v. Arrow Fin. Servs., LLC,* 565 U.S. 368, 383

(2012)). As the Supreme Court has explained, "where Congress intends to

preclude judicial review of constitutional claims[,] its intent to do so must

be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). Nothing in the CDA

comes close.[2]

Second, the district court gravely misapplied this Court's precedents in

concluding that the PSCA's claims should be understood as being "at

bottom" contractual. Whether a claim against the government "is in 'its

essence' contractual"—potentially requiring channeling to the Court of

Federal Claims or an agency board of contract appeals—turns on two

factors: (1) "the source of the rights upon which the plaintiff bases its

claims" and (2) "the type of relief sought (or appropriate)." *Perry Cap. LLC*

---

[2] Nor does *National Treasury Employees Union v. Vought* ("*NTEU*"), 149 F.4th 762 (D.C. Cir. 2025), suggest otherwise. *NTEU* held only that the CSRA bars civil-service employees from challenging their terminations in district court, even when those terminations are part of a broader plan to shutter an agency. *Id.* at 774–76. But *NTEU* interpreted the CSRA, not the CDA, and the Supreme Court has made clear that jurisdiction-stripping is a statute-specific inquiry. *Thunder Basin*, 510 U.S. at 207; *Free Enter. Fund*, 561 U.S. at 489. The CDA is nothing like the CSRA: the former provides only narrow, contract-based remedies in the CFC, 28 U.S.C. § 1491(a); the latter furnishes a comprehensive remedial framework. *NTEU*, 149 F.4th at 775.

*v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). The first factor asks whether the claim is "founded only on a contract" or instead "stem[s] from a statute or the Constitution." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992), *overruled on other grounds by Perry Cap.*, 864 F.3d at 620. The second factor "boils down to whether the plaintiff effectively seeks to attain monetary damages." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022).

Here, both factors confirm Article III jurisdiction: the PSCA's motion for a preliminary injunction did not allege a breach, seek to enforce any duty imposed by contract, or request money damages. The fact that Defendants' dismantling of USAID also terminated contractual employment relationships does not by "some mystical metamorphosis, automatically transform" the PSCA's constitutional and APA claims into contract claims. *Megapulse*, 672 F.2d at 968. This is not a contract action in disguise. *See also Axon*, 598 U.S. at 194 (explaining that the channeling inquiry requires focusing on "the nature of the claim").

Third, the ultimate test before pre-empting district court jurisdiction is whether "the claims at issue *'are of the type'* Congress intended to" channel away from district courts. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)) (emphasis added). Here, the answer to that question is unmistakable.

It is inconceivable that challenges to the Executive's usurpations of legislative authority are "of the type" that Congress intended to channel to the CFC. 41 U.S.C. § 7105(e)(1)(D).[3] First, except in "very limited circumstances," *Wagstaff v. United* States, 105 Fed. Cl. 99 (2012), the CFC categorically cannot grant equitable relief of any kind. *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988). Noting that the CFC's very limited equitable powers do include, however, "directing restoration to office or position," 28 U.S.C. § 1491(a)(2), the district court questioned "why [it] is" that that context is not "present here." JA885. The answer is

---

[3] The CDA allows a contractor dissatisfied with a contracting officer's decision to appeal either to the CFC or to an agency board such as the Civilian Board of Contract Appeals. 41 U.S.C. § 7104. But the relief available and the claims cognizable are the same in both fora. *Id.* § 7105(e)(2). The channeling analysis is therefore identical.

straightforward: the CFC may order that relief only as "an incident of" a money judgment, 28 U.S.C. § 1491(a)(2), which is relief the PSCA does not and cannot seek. *Mote v. United States*, 110 F.4th 1345, 1353 (Fed. Cir. 2024) ("The Claims Court … 'has no power to grant affirmative non-monetary relief unless it is tied *and subordinate to* a money judgment'") (quoting *James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998)) (emphasis added). The district court further observed that the CFC has jurisdiction to resolve a "'nonmonetary dispute[]' 'concerning termination of a contract.'" JA885 (quoting *H&M Assocs., LLC v. United States*, 165 Fed. Cl. 174, 184 (2023)). But that, too, misses the mark. The CFC's jurisdiction in that area extends only to matters a contracting officer could resolve in the first instance, 28 U.S.C. § 1491(a)(2), and the PSCA's challenge to shutting down a federal agency is well beyond any contracting officer's purview. *See Sergent's Mech. Sys., Inc. v. United States,* 157 Fed. Cl. 41, 49-50 (2021). Channeling the PSCA's claims would, therefore, foreclose meaningful judicial review. *Thunder Basin,* 510 U.S. at 212-13. Finally, it is "well-settled" that the CFC cannot issue preliminary injunctions—and particularly not in CDA cases. *Sergent's Mech.*, 157 Fed. Cl. at 50.

Fourth, while the CFC knows a good deal about tax refund suits, contract disputes, civilian and military pay claims, bid protests, and vaccine injury claims—the cases that make up most of its docket[4]—it knows "nothing special about the separation of powers," a subject both collateral to the CDA's review scheme and outside the CFC's expertise. *Axon*, 598 U.S. at 194-95 (discussing how structural constitutional challenges are ill suited to being channeled). And the Civilian Board of Contract Appeals' expertise is even narrower. *See* 41 C.F.R. § 105-53.132(b). They are both "'ill suited to address structural constitutional challenges'— like those maintained here." *Axon*, 598 U.S. at 194–95 (quoting *Carr v. Saul*, 593 U.S. 83, 92 (2021)).

In short, it would be "nothing less than remarkable," *Bowen*, 487 U.S. at 908, to conclude that Congress intended "fundamental, even existential" structural questions of constitutional law, *Axon*, 598 U.S. at 180, "to be reviewed in a specialized forum such as the Court of Claims." *Bowen*, 487

---

[4] See Statistical Report of the U.S. Court of Federal Claims, https://www.uscfc. uscourts.gov/sites/cfc/files/statistical_report_ 2024.pdf.

U.S. at 908. Separation-of-powers claims belong in Article III courts where they have always been heard.

**B.    The Supreme Court's recent emergency-docket order and accompanying opinions in *NIH v. American Public Health Association* confirm the district court's § 1331 jurisdiction here.**

The Supreme Court's order and opinions in *National Institutes of Health v. American Public Health Association ("NIH")*, 145 S. Ct. 2658 (2025) (Mem.), underscore that claims of the sort the PSCA asserts here are well within district courts' jurisdiction. In *NIH,* the Supreme Court stayed the portion of the district court's judgment that set aside specific grant-termination decisions, which the Supreme Court described as claims tied directly to an "'obligation to pay money'" under particular grants. *Id.* at 2660 (quoting *Department of Education v. California ("California")*, 604 U.S. 650, 651 (2025) (per curiam)).

But Justice Barrett's controlling concurrence drew a sharp and dispositive distinction. She emphasized that the stay did *not* reach the district court's vacatur of NIH's guidance documents implementing recent Executive Orders. *Id.* at 2661 (Barrett, J., concurring in partial grant of application for stay). Because "vacating the guidance does not necessarily

void decisions made under it," her "preliminary judgment" was that the district court had jurisdiction over challenges to the guidance itself under the APA, even if not over terminations of particular grants. *Id.* at 2662. *See also id.* at 2662-63 (Roberts, C.J., concurring in part and dissenting in part) (arguing, on behalf of four justices, that all of the plaintiffs' claims were subject to APA review).

That same logic applies squarely here: the PSCA challenges an overarching policy, implemented through agencywide directives, to dismantle USAID. *NIH* establishes that the district court had jurisdiction over the decisions about USAID challenged here.

Other recent per curiam orders involving the government's financial obligations do not suggest otherwise. In *California*, for example, the district court invalidated the termination of specific grants as arbitrary and capricious in violation of the APA. *California v. Dep't of Education*, 769 F. Supp.3d 72, 77-78 (D. Mass. 2025). The Supreme Court stayed that relief because "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *California*, 604 U.S. at 651. But the PSCA seeks no such relief. Its claims do

not rely on any particular grant or contract; it does not seek payment of money; and it advances statutory, structural constitutional, and ultra vires claims of a profoundly different character than challenges to discrete grant terminations.

Likewise, the Court's per curiam order in *Department of State v. AIDS Vaccine Advocacy Coal.* ("*AVAC*"), 606 U.S. __, 2025 WL 2740571 (Sept. 26, 2025) (per curiam) does not support divesting the district court of jurisdiction in this case. In *AVAC*, the district court enjoined the Executive to obligate several billion dollars in foreign-aid funds that were weeks away from expiration, *id.* at *1, and for which the President had submitted a rescission message to Congress. *Id. at* *2 (Kagan, J., dissenting). The Supreme Court granted a stay, emphasizing that it was not making a decision on the merits and concluding that, "at this early stage," the Government had shown a likelihood that the ICA barred an APA suit to enforce those specific appropriations. *Id.* at *1. This case does not solely involve the impending lapse of particular appropriations for which the President had issued a rescission message.

In short, *NIH, California,* and *AVAC* point in the same direction: district court jurisdiction remains available for claims like the PSCA's.

## III. The PSCA satisfied every requirement for preliminary relief, and the district court committed legal error when it concluded otherwise.

The standards for a preliminary injunction are familiar. Beyond standing and jurisdiction, a plaintiff seeking preliminary relief must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm if the requested preliminary relief is not granted; (3) that the balance of equities favors relief; and (4) that the public interest favors relief. *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 20 (2008). When the government is the opposing party, the last two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The PSCA made the required showings. To the extent the district court held otherwise, it misapplied the law.

### A. The PSCA is not merely likely but very likely to succeed on the merits.

The district court did not reach the merits of the PSCA's five claims, which rest on bedrock principles, including constitutional principles the Framers would be aghast to see questioned. On each, the PSCA is very likely to succeed.

### 1. *The PSCA's separation-of-powers claim.*

The PSCA's first claim proceeds under non-statutory review to enforce the Constitution's separation of powers.[5] It is grounded in two bedrock principles. First, the Executive may not unilaterally extinguish a Congressionally created agency. *Myers v. United States,* 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction"); *Free Enter. Fund*, 561 U.S. at 500 ("Congress has plenary control over the …

---

[5] The controlling precedents for judicial review of a President's actions are *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992), *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), and *Kendall v. United States*, 37 U.S. 524 (12 Pet.) (1838). This Court recently limited the availability of some equitable constitutional claims arising from Executive action that violates particular statutes. *Global Health Council v. Trump*, 153 F.4th 1, 14-17 (D.C. Cir. 2025); *NTEU*, 149 F.4th at 791-94. But as Judge Pan argued in dissent in *Global Health*, that ruling is inconsistent with *Franklin, Youngstown,* and *Kendall,* and with precedents of this Court that have long recognized constitutional challenges to the Executive's refusals to execute or enforce the law. *Global Health Council*, 153 F.4th at 38-44 (Pan, J., dissenting and discussing cases). *See also Global Health Council v. Trump*, 2025 WL 2709437, *3 (D.C. Cir. Aug. 28, 2025) (Pan, J., dissenting from denial of rehearing en bancand urging this Court to take up this issue at the earliest opportunity). The pending *NTEU* petition for rehearing en banc raises this issue. *See* Case No. 25-5091 (D.C. Cir.), Doc. 1208780610 (filed Sept. 29, 2025). But in addition, *Global Health* is distinguishable because it involved grantees challenging the impoundment of specific funds, not—as here—claims challenging the wholesale destruction of a federal agency.

existence of executive offices"). Second, the Constitution vests Congress—exclusively—with "the power of the purse." U.S. Const., art. I, § 8, cl. 1; *id.* art. I, § 9, cl. 7 (prohibiting government expenditures "but in Consequence of Appropriations made by Law"). Congress, not the Executive, controls the disbursement of federal funds, and it exercises that power by passing appropriations that carry the force of law.

### 2. The PSCA's Take Care Clause claim.

The PSCA's second claim, also a non-statutory review claim, charges that the President failed to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3—by flouting Congressional mandates regarding USAID and its funding, including the duty to spend the "full amount" of funds that Congress appropriated. *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *id.* at 260 (noting that "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress").

### 3. The PSCA's APA claim for arbitrary and capricious agency action.

The PSCA's third claim challenges final agency action that has been "arbitrary, capricious, [or] an abuse of discretion," 5 U.S.C. § 706(2)(A),

because Defendants' stated justification—"realigning" foreign assistance "with the foreign policy of the President," Exec. Order No. 14169—bears no rational connection to their wholesale dismantling of USAID. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). They also failed to consider less drastic alternatives. *Id.* at 51. And they ignored significant reliance interests created by decades of bipartisan foreign assistance policy. *Dep't of Homeland Security v. Regents of the Univ. of California*, 591 U.S. 1, 30-31 (2020) (discussing the types of reliance interests an agency must consider when it "changes course"). Instead, Defendants engaged in a chaotic, unreasoned, and massively disruptive agency shutdown in violation of the APA.

APA review here is unaffected by *NTEU.* 149 F.4th 762. There, this Court held that the plaintiffs' alleged and contested "shutdown" did not meet the APA's requirement for final and discrete agency action. *Id.* at 781-86. This case, by contrast, involves a definitive, final agency decision—not the "constellation of then-ongoing actions" insufficiently ripe for judicial review or "an unrecorded rule—the existence of which the agency denies," described in *NTEU. Id.* at 784–85, 789. Defendants' "Final Mission"

memorandum (JA259-62) expressly directs the dismantling of USAID with immediate operational and workforce consequences. And *NTEU* itself recognized a shutdown memorandum almost identical to this one would be reviewable. *Id.* at 789–90. In addition, the evidence here demonstrates that the decision to eliminated was already made and being implemented before the "Final Mission" email. JA340-42, 376-82, 462-470, 690, 693-94, 697, 709, 712, 714, 723, 728-29, 747, 749, 751-55, 757-61, 764, 767. And *NTEU* is also distinguishable because none of the concerns about judicial intrusion that animated that decision are present here. See, e.g., *id.* at 777, 786 ("how many employees the agency may terminate, how many contracts it may cancel, how it may approve work, which buildings it must occupy"). By contrast, the PSCA primarily sought a plan for lawful agency operation, not an injunction ordering "all kinds of agency actions that were not themselves legally required," *id.* at 789. Finally, *NTEU* is also the subject of a pending petition for rehearing en banc. See Case No. 25-5091 (D.C. Cir.), Doc. 1208780610 (filed Sept. 29, 2025)).

### 4. *The PSCA's APA claim for agency action not in accordance with law.*

The PSCA's fourth claim challenges final agency action "not in accordance with law," 5 U.S.C. § 706(2)(A), because by dismantling USAID and impounding funds Defendants have violated the Constitution, Congressional appropriations acts, the Impoundment Control Act, the Antideficiency Act, and the APA itself. See *supra* at 6-11 (discussing the statutory frameworks governing foreign aid and USAID, the express limitations on the Executive's ability to reorganize or eliminate USAID, and the specific spending mandated by appropriations laws).[6]

### 5. *The PSCA's ultra vires claim.*

Fifth, in the alternative, the PSCA asserts an equitable ultra vires claim to enjoin and declare unlawful Defendants' extreme legal error in unilaterally dissolving a Congressionally created agency and impounding

---

[6] The ICA prohibits the Executive from unilaterally refusing to spend appropriated funds and allows for deferrals of spending only in very limited circumstances not present here. See 2 U.S.C. §§ 682-84. But see *Global Health*, 153 F.4th at 17-20 (holding that the ICA is not enforceable through the APA). The Antideficiency Act likewise prohibits the Executive from creating reserves of funds except in limited circumstances not present here. 31 U.S.C. § 1512(c)(1). Neither statute allows the Executive to withhold appropriated funds due to policy disagreements with Congress.

billions of dollars of duly enacted appropriations—without statutory authorization or constitutional warrant. JA234.

* * * * * *

All these claims rest on constitutional bedrock. As *Youngstown* makes clear, the Executive's power "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Here, Defendants acted with neither.

The Executive cannot thwart Congress's will by canceling, withholding, or countermanding appropriations, *Train v. City of New York*, 420 U.S. 35 (1975), and neither can it unilaterally shutter Congressionally created agencies. Those powers belong to Congress, and even Congress cannot cede them. *Clinton*, 524 U.S. at 452 (Kennedy, J., concurring) ("Congress cannot yield up its own powers").

If the law were otherwise—if a President could nullify legislation by declining to spend funds or shuttering agencies at will—the Executive would possess "'unbounded power'" over the public purse, public policy, and individual liberty, bending each to his will "'at his pleasure.'" *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012)

(quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213–14 (1833)). And the Framers' careful three-branch construction, expressly designed to prevent tyranny, would be destroyed.

These settled principles leave no doubt. The PSCA is very likely to prevail on the merits of its claims.

**B.   The district court erred by using the wrong legal standard for evaluating irreparable harm and by ignoring both the nature of the harm and the consequences of not acting.**

The district court's analysis of irreparable harm applied the wrong legal standard, failed to address the actual alleged harm, and thwarted the purpose of preliminary relief.

### 1.   *The district court applied the wrong legal standard.*

The district court asked whether the PSCA had demonstrated an irreparable injury that is "certain, great, actual, and imminent." JA887 (cleaned up). But that is not the test. The law requires only that a plaintiff "is *likely* to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20 (emphasis added). "Damocles's sword does not have to actually fall … before the court will issue an injunction." *Newby*, 838 F.3d at 9. The PSCA met that standard.

## 2. The district court seriously misconceived the nature of the harm here.

The district court took the wrong view of both the posture of this case and the nature of the harm.

The PSCA moved for preliminary relief in April 2025, before the destruction of USAID was complete and more than sixty days before the government's July 2 RIF targeting "substantially all USAID personnel." JA251. See also JA260, 265-66. The point of the motion was to *prevent* that destruction, not to wait for the axe to fall and then chronicle the devastation. And the harms the PSCA identified—and that have in fact now materialized—were not simply that PSCA members would need to look for new jobs. It was far more fundamental: absent preliminary relief, PSCA members would likely be unable to return to their careers as public servants delivering foreign aid because USAID would not survive. There would be no workplace to return to—only an "empty agency with no [surviving] infrastructure." *Widakuswara v. Lake,* 779 F. Supp. 3d 10, 31 n.22 (D.D.C. 2025), *appeal pending,* No. 25-5144. Thus, the district court applied the wrong legal standard when it faulted the PSCA for not supplying "for instance, any declarations from terminated PSCs unable to find new

work[.]" JA887-88.

Job loss is not always an irreparable harm. But the imminent, actual, wholesale elimination of USAID's workforce presented a "genuinely extraordinary situation" that "far depart[s] from the normal situation." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974).

### 3. *The district court misapplied the law by ignoring the core purpose of preliminary relief.*

The irreparable harm inquiry is flexible, not monolithic, and ultimately functional. Its role is to frame this critical question: Will denying preliminary relief likely compromise the possibility of meaningful corrective relief later?

"The fundamental purpose in granting preliminary injunctive relief has always been to preserve the court's ability to later render a meaningful final decision on the merits." *Fairfield Cnty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd as modified sub nom. Fairfield Cnty. Med. Ass'n v. United Healthcare of New Eng.*, 557 Fed. Appx. 53 (2d Cir. 2014). See also C. Wright & A. Miller, 11A Fed. Prac. & Proc. § 2947 (3d ed. 2004) ("Although the fundamental fairness of preventing irremediable harm to a party is an important factor on a

preliminary-injunction application, the most compelling reason in favor of entering a Rule 65(a) order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act").

These principles, moreover, are at their zenith when, as here, the danger is the uncontested, ongoing dismantling of an institution—whether a business or a federal agency. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (the likely "destruction in its current form" of a business or institution in the absence is an irreparable harm). These are "Humpty Dumpty" cases: once the pieces are scattered, it becomes much more difficult for a court to order the pieces put back together again. Withholding preliminary injunctive relief in these circumstances rewards the party intent on destruction for racing ahead to make the destruction a fait accompli, depriving the judiciary of the power to grant an effective remedy and vindicate its own judgments.

Preliminary relief prevents parties from "making unilateral and irremediable changes during the course of litigation," *O Centro Espirita Beneficente Uniao do Vegetal*, 389 F.3d 973, 1015 (10th Cir. 2004) (McConnell, J., concurring), in circumstances where, without such relief, "a favorable

final judgment might well be useless" by the time it arrives. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975). "[T]he purpose of the preliminary injunction is the protection of the efficacy of the court's remedial options." Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809, 872 (2025).

There is no switch that can be flipped from "off" back to "on" to fully restore USAID, after dismantling, to full function. JA270-78, 324-26, 440-46, 494-96. "[S]hutting down necessary systems, laying off personnel [en masse], and terminating contracts, even ones that might be able to be eventually reinstated, halt agency function in the short term and threaten the efficacy of the agency in the long-term." *Widakuswara v. Lake,* 773 F. Supp. 3d 46, 59 (S.D.N.Y. 2025). It takes "months, if not years, to piece back together [a dismantled agency's] infrastructure, staff, and contractual relationships to fully function again after this damage is done." *Id.* at 59-60. "In short, these harms cannot be remedied with mere money damages." *Id.* at 60.

**C. The district court erred by treating the President's defiance of Congress as weighing in his favor and by failing to address the PSCA's overwhelming—and undisputed—evidence of the broader public interests at stake.**

As this Court has emphasized, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations," and "generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12 (citation omitted). As a result, when the government is a party, these public interest and equities factors "merge." *Nken*, 556 U.S. at 435.

Yet the district court suggested that it was "difficult to weigh" the public interest against Defendants' asserted interest in "aligning the United States' foreign aid programs with American values." JA889. That was a serious legal error. Congress has mandated—with unmistakable clarity— that USAID is an independent establishment and that appropriated dollars "shall" be made available to USAID "in the amounts specifically designated" for precise, legally binding purposes. As a matter of law, the President has no cognizable interest in defying those mandates.

Compounding the error, the district court also failed to consider the undisputed evidence of public harm. The record shows that shuttering

USAID has already resulted in catastrophic global consequences: mass

hunger, preventable disease, and death on a staggering scale. Hundreds of

thousands have died; they cannot be revived. Children born HIV-positive

cannot be uninfected. Shortages of critical medications, food, and other

supplies cannot be reversed by an order issued next week, next month, or

next year.[7] The PSCA submitted substantial evidence of this devastation;

the Government did not contest it. JA329-30, 346-60, 389-90. The district

court ignored it.

* * * * * *

The district court committed legal error at every step. The PSCA

demonstrated a clear likelihood of success; a clear likelihood of irreparable

harm; that the equities tip sharply in its favor; that Congress has already

determined where the public interest lies—in providing not terminating

---

[7] See also Atul Gawande, *The Shutdown of U.S.A.I.D. Has Already Killed Hundreds of Thousands*, The New Yorker (Nov. 5, 2025), available at https://www.newyorker.com/culture/the-new-yorker-documentary/the-shutdown -of-usaid-has-already-killed-hundreds-of-thousands ; Hana Kiros, *'In Three Months, Half of Them Will Be Dead,'* The Atlantic (Apr. 16, 2025), available at https://perma.cc/B2J7-VR43; Impact Metrics Dashboard, available at https://perma.cc/4KJD-U3AD.

foreign aid; and that allowing the destruction of USAID would cause immeasurable human suffering. Preliminary relief was warranted.

## CONCLUSION

The Court should reverse the denial of preliminary injunctive relief and remand to the district court. Because the destruction of USAID has continued—and the resulting harms have continued to mount—the appropriate scope and terms of injunctive relief may differ, today, from those presented in April 2025, when the PSCA moved for a preliminary injunction, or July 2025, when the district court denied it. That is hardly unusual. *See J.G.G. v. Trump,* 2025 WL 2317650, *3 (D.C. Cir. Aug. 8, 2025) (per curiam) (vacating preliminary injunction and remanding for further proceedings in light of "changed circumstances," citing 28 U.S.C. § 2106).

Accordingly, this Court should correct the district court's legal errors and direct the district court to reassess injunctive relief in light current conditions on remand.

Dated: November 26, 2025

Respectfully submitted,

*/s/ Joshua Karsh*

JOSHUA KARSH
*Mehri & Skalet PLLC*
*2000 K Street, NW, Ste 325*
*Washington, D.C. 20006*
*jkarsh@findjustice.com*
*773-505-7533*

MARNI WILLENSON
*Willenson Law, LLC*
*3420 W. Armitage Ave., Ste 200*
*Chicago, IL 60647*
*(312) 546-4910*

CAROLYN E. SHAPIRO\*
*Schnapper-Casteras PLLC*
*200 E. Randolph St., Ste. 5100*
*Chicago, IL 60601*
*(312) 520-7533*

*\*Member of the Illinois bar with a D.C.*
*practice limited to federal litigation. Not a*
*member of the District of Columbia Bar.*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations set forth in this Court's Order of June 9, 2025, because it contains 11,952 words, not including the portions excluded by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Book Antiqua font.

Dated: November 26, 2025

*/s/ Joshua Karsh*

## CERTIFICATE OF SERVICE

I certify that, on November 26, 2025, a true and correct copy of this

filing was filed with the Clerk for the United States Court of Appeals for

the District of Columbia Circuit using the Court's electronic filing system,

which will forward a copy to all counsel of record.

Dated: November 26, 2025

*/s/ Joshua Karsh*