**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5291**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

PERSONAL SERVICES CONTRACTOR ASSOCIATION,

Plaintiff-Appellant,

v.

DONALD J. TRUMP, President of the United States of America; DEPARTMENT OF STATE; UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT; MARCO RUBIO, Secretary of State and Acting Administrator of United States Agency for International Development; JEREMY LEWIN, Deputy Administrator and Chief Operating Officer of USAID; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, Director of OMB; UNITED STATES DOGE SERVICE; UNITED STATES DOGE TEMPORARY SERVICE; DEPARTMENT OF GOVERNMENT EFFICIENCY; DEPARTMENT OF TREASURY; SCOTT BESSENT, Secretary of Treasury,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

### BRIEF FOR APPELLEES

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

JEANINE PIRRO
  *United States Attorney*

SARAH WELCH
TIBERIUS DAVIS
  *Counsel to the Assistant Attorney General*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202)-514-4357*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.      Parties and Amici

Defendants-Appellees are Donald J. Trump, President of the United States of America; United States Department of State; United States Agency for International Development; Marco Rubio, Secretary of State and Acting Administrator of United States Agency for International Development; Jeremy Lewin, Deputy Administrator and Chief Operating Officer of USAID; Office of Management and Budget; Russell Vought, Director, Office of Management and Budget; United States DOGE Service; U.S. DOGE Temporary Service; "Department of Government Efficiency"; United States Department of the Treasury; and Scott Bessent, Secretary of the Treasury.

Plaintiff-Appellant is the Personal Services Contractor Association.

The Constitutional Accountability Center was an amicus in the district court. There were no intervenors in district court. Amici in this Court include the Constitutional Accountability Center, Physicians for Human Rights, Dr. Dvora Joseph Davey, Dr. Salim Safurdeen Abdool Karim, and Mary Doe. There have been no intervenors in this Court to date.

### B.    Rulings Under Review

The rulings under review (issued by Judge Carl J. Nichols) are the memorandum opinion and order filed on July 25, 2025, denying Appellant's motion for a preliminary injunction. The memorandum opinion is available at 792 F. Supp. 3d 116.

### C.    Related Cases

The case on review has not previously been before this Court or any other court. There are several related pending cases within the meaning of D.C. Circuit Rule 28(a)(1)(C):

*American Fed'n of Government Employees v. Trump*, No. 25-5290 (D.C. Cir.).

*Does 1-26 v. Musk*, No. 25-1273 (4th Cir.).

 */s/ Tiberius Davis*
Tiberius Davis
*Counsel to the Assistant Attorney General*

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION.................................................... 3

STATEMENT OF THE ISSUE........................................................... 3

STATEMENT OF THE CASE............................................................ 3

    A.    The Statutory Framework For Federal Contract Disputes ................... 3

    B.    The Statutory Framework For Foreign Aid ......................................... 6

    C.    Factual Background............................................................................. 7

    C.    Prior Proceedings ............................................................................... 9

SUMMARY OF ARGUMENT ........................................................... 14

STANDARD OF REVIEW ................................................................. 17

ARGUMENT ....................................................................................... 18

I.    Plaintiff Has Not Shown That Its Claims Are Likely Justiciable. ............... 18

A.    Plaintiff Lacks Standing To Assert Any Non-Contractual Claims. ............. 19

    B.    Plaintiff's Claims Are Subject To The Contract Disputes Act. .......... 32

II.    Plaintiff Failed to Establish the Remaining Preliminary Injunction Factors............................................................................................................ 45

CONCLUSION .................................................................................... 50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iii

## TABLE OF AUTHORITIES

*A & S Council Oil Co. v. Lader*,
   56 F.3d 234 (D.C. Cir. 1995).................................................................... 5, 35, 42

*AFGE, Local 2128 v. FLRA*,
   716 F.3d 617 (D.C. Cir. 2013)...................................................... 43, 44

*AFGE v. FLRA*,
   929 F.3d 748 (D.C. Cir. 2019)............................................................43

*Ahuja v. Detroit Steel Corp.*,
   62 F.4th 313 (6th Cir. 2023)...................................................................44

*Axon Enterprise, Inc. v. Federal Trade Commission*,
   598 U.S. 175 (2023) ...................................................... 30, 44

*Biden v. Texas*,
   597 U.S. 785 (2022) ...................................................... 27, 41

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ...........................................................................28

*Campo v. United States*,
   169 Fed. Cl. 502 (2024)..........................................................43

*Center for Biological Diversity v. United States Dep't of the Interior*,
   144 F.4th 296 (D.C. Cir. 2025) ...................................... 14, 20, 21, 24

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006)...................................... 17, 18, 46

*City of Las Vegas v. Lujan*,
   891 F.2d 927 (D.C. Cir.1989)..........................................................17

*Clevinger v. Advoc. Holdings, Inc.*,
   134 F.4th 1230 (D.C. Cir. 2025) ...................................... 46, 47

iv

*Clinton v. City of New York,*
　524 U.S. 417 (1998) ..................................................................... 29, 30

*Sustainability Inst. v. Trump,*
　-- F.4th --, 2026 WL 157120 (4th Cir. Jan. 21, 2026) ................................ 41, 43

*Crowley v. N. Am. Commc'ns, Inc.,*
　38 F.4th 100 (2d Cir. 2022) ........................................................... 36, 37

*Dai Glob. v. Adm'r of USAID,*
　945 F.3d 1196 (Fed. Cir. 2019) ........................................................34

*DaimlerChrysler Corp. v. Cuno,*
　547 U.S. 332 (2006) ............................................................. 15, 20, 25

*Dalton v. Sherwood Van Lines, Inc.,*
　50 F.3d 1014 (Fed. Cir. 1995) ......................................................... 5, 35

*Dalton v. Specter,*
　511 U.S. 462 (1994) ....................................................................41

*Department of Education v. California,*
　145 S. Ct. 966 (2025) ............................................................... 38, 39

*E.T. v. Paxton,*
　41 F.4th 709 (5th Cir. 2022) ......................................................... 24, 25

*Filebark v. U.S. Dep't of Transp.,*
　555 F.3d 123 (9th Cir. 2009) ...........................................................44

*Food & Drug Admin. v. All. for Hippocratic Med.,*
　602 U.S. 367 (2024) ................................................................ 24, 32

*Food & Water Watch, Inc. v. Vilsack,*
　808 F.3d 905 (D.C. Cir. 2015) ........................................................ 18, 45

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
　561 U.S. 477 (2010) ....................................................................42

*Gas Co. v. FERC*,
    758 F.2d 669 (D.C.Cir.1985) .................................................................46

*Gill v. Whitford*,
    585 U.S. 48 (2018) ................................................................... 20, 28

*Global Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025) ....................................................... 40, 41

*Goldman v. Brions Fruits Co.*,
    594 U.S. 220 (2021) ...........................................................................31

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    920 F.3d 1 (D.C. Cir. 2019) ...............................................................45

*Hazlehurst v. Secretary of Health & Human Servs.*,
    177 Fed. Cl. 479 (2025) ......................................................................43

*In re Navy Chaplaincy*,
    697 F.3d 1171 (D.C. Cir. 2012) .........................................................17

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ...........................................................27

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985) ..................................................... 35, 37, 39

*INS v. Chadha*,
    462 U.S. 919 (1983) ...........................................................................29

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
    103 F.4th 748 (10th Cir. 2024) ..........................................................48

*Lee v. United States*,
    127 Fed. Cl. 734 (2016) ............................................................. 4, 7, 33

*Lewis v. Casey*,
    518 U.S. 343 (1996) ...........................................................................28

*Lucia v. Securities and Exchange Commission*,
    585 U.S. 237 (2018) ...........................................................................30

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..................................................................... 21, 25

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ..................................................................... 21, 27

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ...........................................................................33

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982).................................................... 35, 36

*Menominee Indian Tribe of Wis. v. United States*,
    614 F.3d 519 (D.C. Cir. 2010)...........................................................35

*Missouri v. Jenkins*,
    515 U.S. 70 (1995) .............................................................................25

*Nationsbank of Tex. v. United States*,
    44 Fed. Cl. 661 (1999).......................................................................43

*NIH v. American Public Health Assoc. (APHA)*,
    145 S. Ct. 2658 (2025).......................................................................45

*Nken v. Holder*,
    556 U.S. 418 (2009).. ........................................................................48

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009)...........................................................44

*PETA v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015).................................................... 22, 24

*Raines v. Byrd*,
    521 U.S. 811 (1997) ..................................................................... 19, 21

vii

*Sampson v. Murray*,
 415 U.S. 61 (1974) ............................................................................47

*Schlesinger v. Reservists Comm. to Stop the War*,
 418 U.S. 208 (1974) ................................................................. 15, 25

*Seila Law LLC v. Consumer Financial Protection Bureau*,
 591 U.S. 197 (2020) ........................................................................31

*Spectrum Leasing Corp. v. United States*,
 764 F.2d 891 (D.C. Cir. 1985)........................................................13

*Sys. Application & Techs., Inc. v. United States*,
 26 F.4th 163 (4th Cir. 2022) ................................................ 4, 16, 33

*Tanner-Brown v. Haaland*,
 105 F.4th 437 (D.C. Cir. 2024) ......................................................22

*Thunder Basin Coal Co. v. Reich*,
 510 U.S. 200 (1994) ........................................................................42

*Todd Constr., L.P. v. United States*,
 656 F.3d 1306 (Fed. Cir. 2011) ............................................ 4, 16, 35

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
 581 U.S. 433 (2017) ............................................................... 11, 26

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021) ........................................................................20

*Trump v. CASA, Inc.*,
 606 U.S. 831 (2025) ............................................................... 28, 32

*United Aeronautical Corp. v. U.S. Air Force*,
 80 F.4th 1017 (9th Cir. 2023)................................................ 4, 34, 35

*United States v. Curtiss-Wright Exp. Corp.*,
 299 U.S. 304 (1936) ........................................................................49

*United States v. Intrados/Int'l Mgmt. Grp.*,
277 F. Supp. 2d 55 (D.D.C.2003) ...................................................................... 4, 34

*United States v. J & E Salvage Co.*,
55 F.3d 985 (4th Cir. 1995) ................................................................................35

*United States v. Kellogg Brown & Root Servs., Inc.,*
856 F. Supp. 2d 176 (D.D.C. 2012) .................................................................. 4, 34

*United States v. Texas*,
599 U.S. 670 (2023) ...........................................................................................19

*Valley Forge Christian Coll. v. Americans United for*
*Separation of Church & State, Inc.,*
454 U.S. 464 (1982) ....................................................................................... 19, 25

*United States v. Fausto,*
484 U.S. 439 (1988) ...........................................................................................43

*Virginia Petroleum Jobbers Association v. Federal Power Commission*,
259 F.2d 921 (D.C. Cir. 1958)............................................................................47

*Widakuswara v. Lake*,
2025 WL 1288817 (D.C. Cir. 2025) ...................................................... 2, 5, 25, 40

*Widakuswara v. Lake*,
2025 WL 1556440 (D.C. Cir. May 22, 2025) ......................................................14

*Winter v. NRDC*,
129 S.Ct. 365 (2008) ...................................................................................... 18, 48

*Youngstown Co. v. Sawyer,*
343 U.S. 579 (1952). ...................................................................................... 29, 40

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) ...............................................................................................48

## **STATUTES**

5 U.S.C. § 702................................................................................................33

22 U.S.C. § 2381 ..................................................................................6

22 U.S.C. § 6563 ..................................................................................6

28 U.S.C. § 1292(a)(1) ..........................................................................3

28 U.S.C. § 1331 ..................................................................................3

28 U.S.C. § 1346(a)(2) .........................................................................35

28 U.S.C. § 1491(a)(2) .........................................................................34

41 U.S.C. § 605(a) ................................................................................5

41 U.S.C. § 7101-09 ..............................................................................3

41 U.S.C. § 7102(a)(2) ..................................................................... 4, 33

41 U.S.C. § 7103(a)(1) .............................................................. 4, 5, 34, 35

41 U.S.C. § 7104(a) .............................................................................34

41 U.S.C. § 7104(b) ......................................................................... 5, 34

41 U.S.C. § 7104(b)(1) .........................................................................34

41 U.S.C. § 7105(e)(1)(B) ................................................................. 5, 34

## Other Authorities

26 Fed. Reg. 10 ...................................................................................6

*Administration of Foreign Assistance and Related Functions*,
   Exec. Order No. 10,973, §§ 101, 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961) .........6

*Foreign Assistance Act of 1961*,
   Pub. L. No. 87-195, 75 Stat. 424 (1961). ..............................................6

*Further Consolidated Appropriations Act, 2024*,
   Pub. L. No. 118-47, 138 Stat. 480 (2024) ...........................................7

*Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999*,
   Pub. L. No. 105-277, 112 Stat. 2681 (1998) ......................................7

*Reevaluating and Realigning United States Foreign Aid,*
   Exec. Order No. 14,169, 90 Fed. Reg. 1,000 (Jan. 22, 2025). ............................49

# GLOSSARY

| | |
|---|---|
| AFGE | American Federation of Government Employees |
| APA | Administrative Procedure Act |
| CDA | Contract Disputes Act |
| CSRA | Civil Service Reform Act |
| FSA | Foreign Service Act |
| FSLMRS | Federal Service Labor-Management Relations Statute |
| PSCA | Personal Services Contractor Association |
| RIF | Reduction-in-Force |
| USAID | U.S. Agency for International Development |

## INTRODUCTION

In this case, an organization representing former government contractors of the U.S. Agency for International Development (USAID) seeks to transform its members' personnel-related claims into a programmatic broadside against the Executive Branch's lawful efforts to restructure the Nation's foreign aid programs to better align with American interests. The plaintiff organization argues that it is vindicating core separation of powers interests, but it ignores basic Article III standing principles and Congress's choice to channel contract-related claims by personal services contractors through the Contract Disputes Act (CDA). Those doctrines reflect equally important separation of powers interests as limits on the judiciary stemming from the Constitution and Congress. The district court was correct to deny the plaintiff organization's motion for a preliminary injunction because it was unlikely to succeed in establishing the court's jurisdiction. As the district court held, plaintiff lacks Article III standing to bring its broadest claims, and the remainder are subject to a mandatory statutory framework that deprives the district court of subject-matter jurisdiction.

The district court's jurisdictional holdings properly respect the limits that both Article III and Congress have placed on suits of this kind. It is axiomatic that plaintiffs may seek redress only for actions that injure them and that their remedy may be no broader than necessary to redress those injuries. But apart from concrete

personnel actions, plaintiff has not identified any part of USAID's alleged dissolution that injures it or its members. For example, it does not explain how it is injured by the cancellation of building leases, the decommissioning of agency assets, or even the transfer of USAID functions to the State Department. In short, without an injury-in-fact caused by the agency's organizational changes, plaintiff lacks standing to challenge those actions or to seek a remedy that sweeps so broadly.

At most, plaintiff has standing to challenge the concrete contract terminations experienced by its members. But as this Court has recognized in a challenge to the alleged closure of another federal agency, these types of claims are subject to a mandatory statutory framework that Congress created to govern federal contracting disputes. *See Widakuswara v. Lake*, 2025 WL 1288817, at *2 (D.C. Cir. 2025). Plaintiff's members may not bypass that framework by heading straight to district court; they first must present their challenges to the relevant forum, following the procedures established by Congress. The district court thus likely lacks subject-matter jurisdiction over the only claims that plaintiff plausibly has standing to bring.

Finally, the non-merits injunction factors do not tip in plaintiff's favor. Though plaintiff argues that its members will suffer irreparable harm, its claimed injuries are either economic in nature or generalized grievances not specific to plaintiff or its members, and the district court correctly held that plaintiff had failed to substantiate them. And because the public has an interest in the President taking

decisive action in the realm of foreign affairs, the public interest and balance of the equities tip in defendants' favor.

PSCA has not established the criteria necessary to obtain the extraordinary remedy of a preliminary injunction, and the Court should affirm.

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1361. JA11. On July 25, 2025, the district court denied plaintiff's motion for a preliminary injunction. JA854-90. Plaintiff filed a timely notice of appeal on August 7, 2025. JA891. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court properly denied a preliminary injunction, because plaintiff's only potentially cognizable claims are subject to a mandatory statutory framework that governs federal contracting disputes and the non-merits considerations do not favor plaintiff.

## STATEMENT OF THE CASE

### A.    The Statutory Framework For Federal Contract Disputes.

Plaintiff is a voluntary association of USAID personal services contractors. The Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101-09, governs the claims of contractors against the federal government.

3

The CDA "establishes an administrative system for disputes relating to federal procurement contracts," *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023), including contracts for "the procurement of services." 41 U.S.C. § 7102(a)(2); *see, e.g.*, *Sys. Application & Techs., Inc. v. United States*, 26 F.4th 163, 170 (4th Cir. 2022) (applying CDA to a services contractor); *Lee v. United States*, 127 Fed. Cl. 734, 736 (2016) (personal service contract dispute heard in the Court of Federal Claims).

The CDA generally governs "disputes concerning 'any express or implied contract … made by an executive agency for … the procurement of services.'" *Sys. Application*, 26 F.4th at 168 (quoting 41 U.S.C. § 7102(a)); *see also* 41 U.S.C. § 7103(a)(1) (requiring exhaustion for claims "relating to a contract"). "[T]o be a claim 'relating to a contract,'" and therefore covered by the CDA, the "claim 'must [only] have some relationship to the terms or performance of a government contract.'" *Sys. Application*, 26 F.4th at 172 (quoting *Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1312 (Fed. Cir. 2011) (alteration in *Sys. Application*)).

Under the CDA, the "contractor [must] take recourse against the government's alleged breach by submitting a written claim to the contracting officer for a final decision prior to commencing suit." *United States v. Kellogg Brown & Root Servs., Inc.,* 856 F. Supp. 2d 176, 183 (D.D.C. 2012) (quoting *United States v.*

4

*Intrados/Int'l Mgmt. Grp.*, 277 F. Supp. 2d 55, 63 (D.D.C.2003) (citing, *inter alia*, 41 U.S.C. § 605(a), now 41 U.S.C. § 7103(a)(1)).

After a properly submitted CDA claim has been exhausted, the proper forum is either the Civilian Board of Contract Appeals, which has jurisdiction to decide any appeal from a decision of a contracting officer on a contract made by USAID or the Department of State, *see* 41 U.S.C. § 7105(e)(1)(B), or the United States Court of Federal Claims, 41 U.S.C. § 7104(b). In that regard, this Court has "recognized a congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes," such that "the Claims Court has exclusive jurisdiction except to the extent that Congress has granted any other court authority to hear the claims that may be decided by the Claims Court." *See A & S Council Oil Co. v. Lader*, 56 F.3d 234, 241 (D.C. Cir. 1995) (cleaned up). After that, "the next appeal lies only to the Federal Circuit." *Id.*

This statutory framework provides "the exclusive procedure[] … for contractor-related claims." *Widakuswara v. Lake*, 2025 WL 1288817, at *2 (D.C. Cir. 2025); *see also Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995) (Contract Disputes Act provides exclusive remedial scheme for covered contracts). Personal services contractors therefore must follow the CDA's statutory channels for resolving their disputes.

**B.     The Statutory Framework For Foreign Aid.**

Congress enacted the Foreign Assistance Act of 1961, Pub. L. 87-195, 75 Stat. 424, to "organize and implement U.S. foreign assistance programs." CRS, *Foreign Assistance Act of 1961: Authorizations and Corresponding Appropriations* 1 (2023). The Act provides that "[t]he President may exercise any functions conferred upon him by [the Act] through such agency or officer of the United States Government as he shall direct." 22 U.S.C. § 2381; *see also, e.g.*, *id.* § 2151b(c)(1) (authorizing the administration of programs "on such terms and conditions as [the President] may determine"); *id.* § 2392(a) (authorizing the President to transfer funding "to any agency … for carrying out the purposes of [the Act]").

In 1961, President Kennedy exercised his authority under the Act and Article II to create USAID by executive order. That order established USAID as "an agency in the Department of State" and delegated "to the Secretary of State … all functions conferred upon the President by" the Act. USAID Exec. Order 10,973, §§ 101, 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961). In 1998, Congress revised USAID's structure by making the agency an "independent establishment," 22 U.S.C. § 6563, with the USAID Administrator "under the direct authority and foreign policy guidance of the Secretary of State," *id.* § 6592. The 1998 statute directed President Clinton to weigh in on these and other organizational decisions within 60 days, *id.* § 6601(a)(1), (d)(1), and he chose to keep USAID a "distinct agency" subject to State Department

6

control, *see* Pub. L. No. 105-277, 112 Stat. 2681 (1998). Subsequent Presidents made additional changes to USAID's structure, including to transfer certain functions and employees to the State Department. *See, e.g.*, GAO, *Foreign Aid Reform: Comprehensive Strategy, Interagency Coordination, and Operational Improvements Would Bolster Current Effort* 26-27 (2009).

More recently, Congress has relied on annual appropriations acts to influence foreign aid policy. *See* CRS, *Foreign Assistance: An Introduction to U.S. Programs and Policy* 29 (2022). For example, in the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, Congress appropriated funds "to the President" in order "to carry out" Foreign Assistance Act programs and reaffirmed that the Secretary "may … transfer funds" under that Act. *Id.* at 739. Congress also therein provided that appropriated funds may not be used to "implement a reorganization [or] redesign" of USAID without "prior consultation" with Congress, including actions to "eliminate" or "consolidate" USAID or "transfer" its authorities "to other agencies." *See id.* at 843-44, § 7063(a), (b); *id.* at 766, § 7015(a).

### C.    Factual Background.

On January 30, 2025, President Trump directed Secretary of State Marco Rubio to perform the functions and duties of the Administrator of USAID in an acting capacity. JA138. The Secretary, in line with the views of the President, concluded that USAID's foreign assistance processes reflected signs of severe

7

inefficiency, and a substantial number of the programs funded by USAID neither substantially benefit the American people, nor reflect the priorities of the President and Secretary. JA136-38. Thus, the Secretary sent a letter to Congress on February 3, stating that Peter Marocco was delegated the duties of Deputy Administrator of USAID and, in consultation with Congress, would "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." JA138.

In line with those objectives, and to thoroughly review the operations of the agency and align its functions to the President's and Secretary's priorities, USAID leadership began placing employees on paid administrative leave and terminating contracts with personal services contractors. JA139, 141-42. USAID had approximately 1,230 personal services contractors. JA174. On February 2, 2025, the agency approved the termination of 791 personal services contractors, representing 814 total contracts, in the United States and in high and middle-income countries like Moldova and Thailand. JA174. Personal services contracts were terminated consistent with contractual and other notice periods. JA174 ("[Personal services contractors] are being given 15 days of notice of intent to terminate, as required by their contracts.").

In March 2025, Secretary Rubio notified Congress of the Department of State and USAID's intent to undertake a reorganization and transfer of functions that

would involve realigning certain USAID functions, discontinuing other USAID functions that do not align with Administration priorities, and transferring responsibility for many of USAID's functions to the State Department. JA246; *see also* JA224-25, JA447.

This goal involves many discrete actions. One action is an agency-wide reduction in force ("RIF") action. Consistent with applicable laws and regulations, beginning on March 28, 2025, USAID personnel were notified of a consolidated agency-wide RIF action. JA447-48. Other actions include the termination of USAID's remaining personal services contracts, effective July 1, 2025, or September 2, 2025, consistent with all contractual and other notice periods and with any travel or repatriation accommodations to which each personal services contractor is entitled. JA447-48; JA174. A further contemplated action is the Department of State's contractual re-engagement with or employment of certain current or former USAID personal services contractors. *See* JA251.

### C.    Prior Proceedings.

On February 18, 2025, plaintiff filed a complaint in district court seeking declaratory and injunctive relief on behalf of its members. JA11; JA25-26. The case was assigned to Judge Nichols, who had already been assigned a similar lawsuit filed on behalf of direct-hire employees by the American Federation of Government Employees and American Foreign Service Association and joined by Oxfam. *See*

*Am. Fed'n of Gov't Emps. v. Trump*, No. 1:25-cv-352 (D.D.C.), *appeal pending*, No. 25-5290 (D.C. Cir.). Plaintiff alleged violations of the separation of powers, the Take Care Clause, and the Administrative Procedure Act. JA13-16. The next day, plaintiff moved for a temporary restraining order requiring the government to "[r]eturn USAID workers employed as personal service contractors … to the terms and conditions of employment they enjoyed on January 19, 2025," authorize them to "resume and continue the work they were performing before January 20, 2025," "[r]escind any termination-of-contract notices sent to [personal services contractors] since January 20, 2025," and "[r]elease money to pay, and pay, [personal services contractors], including for back wages owed and for covered expenses they have already incurred but have not been reimbursed for, consistent with the terms of their contracts and any relevant statutes and regulations." JA28-29.

Following hearings and additional briefing, on March 6, 2025, the district court denied plaintiff's motion for a temporary restraining order in an oral ruling. JA895-909.

Plaintiff filed an amended complaint on April 17 and moved for a preliminary injunction on April 23, 2025. JA6; *see* JA214-36. The amended complaint added defendants and pleaded a new ultra vires claim. *Id.* In addition to seeking broad relief from what plaintiff describes as "dismantling USAID," the amended complaint continues to seek an order barring the government from "taking steps to suspend,

10

eliminate, consolidate, or downsize USAID, its workforce, or contracts" or "enforcing or giving effect to termination notices sent to U.S. personal services contractors" after January 20, 2025, unless the government files "a plan showing how [it] will timely obligate the full amount of" funds appropriated to USAID, "maintain staff levels at USAID adequate to obligate," "oversee," and "administer" appropriated funds, and "carry out all other statutorily mandated USAID activities." JA216. The preliminary injunction sought the same relief. JA237-38.

On July 25, 2025, the district court entered a single order that denied plaintiff's motion for a preliminary injunction and, in *American Federation of Government Employees*, granted the government's motion to dismiss for lack of jurisdiction and denied the plaintiffs' motion for summary judgment. JA854-90.

The district court began with Article III standing. The court recognized that "plaintiffs must demonstrate standing for each form of relief sought," such that it "must look at plaintiffs' claims and requested remedies separately and ask, for each, whether it would redress an injury-in-fact that is fairly traceable to the government's conduct." JA865 (citing *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017)). The court "assume[d] without deciding" that plaintiff unions and PSCA "have standing to challenge the government's actions with respect to the employment or contract status and related working conditions of USAID's employees and [personal services contractors], and to seek relief from those discrete

11

personnel actions." JA868. But the court held that plaintiff likely lacks standing "to challenge the government's *non*-personnel actions with respect to USAID, such as its grant terminations, website closures, and lease transfers, where the associations have alleged no concrete and particularized injuries flowing from those actions specifically." JA868. Critically, the requested relief "spans far beyond, and thus would *not* redress, the personnel-related injuries [it] ha[s] alleged." JA869. And while the plaintiffs suggested the government's actions "have caused their members to fear a 'global humanitarian crisis,'" that was "an undifferentiated 'generalized grievance' that is 'common to all members of the public.'" JA868 n.15.

The court next held that it lacked subject-matter jurisdiction over plaintiff's personnel-related claims. Even assuming it had Article III standing to raise those claims, "the Contract Disputes Act … likely channels" the claims "to either the Board of Contract Appeals or the Court of Federal Claims," where plaintiff "has Article III standing to sue only because of its members' contractual relationships with USAID and expressly seeks reinstatement of their contracts." JA874 (alterations and internal quotation marks omitted). The district court observed that the rights plaintiff sought to assert were "the contract rights of its members," so the only rights that it could have standing to press were contractual in source. JA883. And the court rejected plaintiff's argument that it should remain in district court because it "alleges both statutory and constitutional violations, rather than straight

12

contract violations," citing cases that concluded that actions were based on contracts even though plaintiffs pleaded violations of statutes and the Constitution. JA884. The district court also concluded that plaintiff sought fundamentally contractual relief because "it is likely that the only relief the PSCA has standing to seek is the reinstatement of its members' contracts with USAID or a declaration that they were wrongfully terminated." JA885-86. The CDA thus channeled their claims even if, "under that scheme, plaintiff cannot receive all its requested relief." JA886 (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894-95 (D.C. Cir. 1985)).

The court also found "highly persuasive" a recent supportive decision by a motions panel of this Court related to the United States Agency for Global Media. JA875; *see Widakuswara v. Lake (Widakuswara II)*, 2025 WL 1288817 (D.C. Cir. May 3, 2025) (per curiam). A district court had required the agency to reinstate employees, in response to claims that the agency was being unlawfully dismantled. The panel stayed that order in relevant part, concluding that "the district court likely lacked subject-matter jurisdiction" to enjoin the agency's personnel actions, "citing the CSRA, FSLMRS, FSA, and CDA" as the exclusive procedures by which federal employees may pursue [employment-related] claims.'" JA876 (quoting *Widakuswara II*, 2025 WL 1288817, at *2). The panel rejected arguments that the litigation "fell outside those schemes because it concerned 'broad government actions to dismantle an entire federal agency' rather than 'simply a collection of

13

employment disputes,'" because federal contractors cannot "circumvent" the schemes by raising "a systemwide challenge to agency policy" instead of "the implementation of such policy in a particular case." JA875-76 (quoting *Widakuswara II*, 2025 WL 1288817, at *2). While the en banc Court granted reconsideration of other aspects of the panel's order, the en banc Court "*denied* reconsideration of the panel's stay of the district court's personnel-related injunction." JA877 (citing *Widakuswara v. Lake*, 2025 WL 1556440 (D.C. Cir. May 22, 2025) (en banc)).

## SUMMARY OF ARGUMENT

The district court properly denied a preliminary injunction. Plaintiff is not likely to succeed on the merits, and the non-merits factors do not favor it. Just like the plaintiffs in the related case, plaintiff's alleged injuries flow from the termination of its members' contracts. A remedy for those alleged injuries is thus governed by the Contract Disputes Act, which conditions the waiver of sovereign immunity on administrative exhaustion and channels breach-of-contract claims to the Board of Contract Appeals and the Court of Federal Claims. Having identified no other potentially cognizable injury, plaintiff lacks standing to bring any other claims.

**I. A.** Plaintiff lacks Article III standing to assert any claims other than contract-related ones. It is axiomatic that a plaintiff "must demonstrate standing for each claim" brought and "for each form of relief" sought. *Center for Biological*

14

*Diversity v. United States Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). Plaintiff has not identified a cognizable injury that would enable it to challenge anything besides its members' concrete disputes regarding their contract terminations. It cannot broadly challenge the agency's alleged closure based on its "generalized interest" in vindicating the separation of powers, because all citizens share that interest. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220, 226-27 (1974). It similarly cannot challenge many of the steps alleged to be part of the "dismantling" of USAID, such as the transfer of leases, removal of webpages, and reorganization of lines of authority, having failed to identify any way in which those actions injured their members. Relatedly, plaintiff cannot obtain remedies that redress such actions, when those remedies are far broader than necessary to redress its actual alleged injuries. Plaintiff's reliance on seminal separation of power cases proves, if anything, that remedies must always be narrowly tailored to the specific injury suffered.

**B.** This Court, like the district court, may assume without deciding that plaintiff has standing to challenge concrete contract terminations affecting its members. Those claims are subject to the Contract Disputes Act, a mandatory statutory framework that deprives district courts of subject-matter jurisdiction over contract claims. The CDA vests exclusive jurisdiction over disputes relating to federal contracts for the procurement of services in the Court of Federal Claims and

agency boards of contract appeals, and it conditions its waiver of sovereign immunity on proper exhaustion by submitting a written claim to the contracting officer for a final decision before commencing a suit. The CDA covers all claims "relating to a contract" within its coverage—that is, claims with "some relationship to the terms or performance of a government contract." *Sys. Application*, 26 F.4th at 172 (quoting *Todd Constr.*, 656 F.3d at 1312). Plaintiff's claims are channeled by the CDA because it challenges stop-work orders and termination of contracts and seeks restoration of those contracts.

**II.** Since plaintiff cannot show a likelihood of success, this Court need not examine the remaining preliminary injunction factors. Even if the Court holds that plaintiff has broader standing and the district court has jurisdiction, it should remand to the district court to address the merits and rebalance the factors in the first instance. Regardless, the district court was correct that plaintiff's contract injuries are ordinary employment injuries that do not amount to irreparable harm. And plaintiff's desire to undo the broader changes at USAID does not reflect an irreparable injury to itself, but rather a generalized concern that is insufficient to meet the high bar for irreparable harm. Without an irreparable harm, a preliminary injunction cannot be granted.

Last, the equitable factors merge and favor the government. Plaintiff's sweeping request for relief would interpose federal courts into sensitive foreign

affairs matters, severely harming the government and public interest. Moreover, plaintiff assumes the merits of its claims but ignores the countervailing separation of powers interests in standing and channeling. The factors thus favor the government, and this Court should affirm the district court's denial of a preliminary injunction.

## STANDARD OF REVIEW

Plaintiff seeks review of the denial of a preliminary injunction, which is an "extraordinary remedy" that requires the movant to "show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotation omitted). Denial of a preliminary injunction is reviewed for abuse of discretion given the "latitude the district court properly enjoys in balancing the four factors that traditionally constitute the preliminary injunction calculus." *City of Las Vegas v. Lujan*, 891 F.2d 927, 931 (D.C. Cir.1989). This Court reviews legal questions de novo and factual questions for clear error. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

## ARGUMENT

The district court lacks jurisdiction over plaintiff's sweeping challenge to USAID's overall operation. Plaintiff's alleged injuries all flow from changes to its members' contracts with the government, and those claims must be adjudicated through the comprehensive scheme that Congress established for the resolution of disputes over federal contracts. Plaintiff lacks Article III standing to bring any other claims or seek any other remedies, having failed to allege any other cognizable injuries. And the non-merits factors do not tip in plaintiff's favor.

## I. Plaintiff Has Not Shown That Its Claims Are Likely Justiciable.

A plaintiff *must* demonstrate a "substantial likelihood of success on the merits" to receive a preliminary injunction. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. This includes showing a substantial likelihood that the plaintiff has standing and the court has jurisdiction over the claims. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). Plaintiff has standing at most to seek redress for contract-related harms. Since Congress channeled such contract claims away from courts like this, the district court also lacked jurisdiction over plaintiff's only possible claim. Plaintiff thus cannot establish a substantial likelihood of success as required for a preliminary injunction. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits").

18

## A. Plaintiff Lacks Standing To Assert Any Non-Contractual Claims.

Plaintiff's only plausibly cognizable injury is related to its members' contract-related actions. Plaintiff thus lacks standing to challenge any other actions, including lease terminations, grant terminations, and other actions, or to seek remedies that are broader than necessary to redress its alleged contract-related injuries. Plaintiff's sweeping assertions to the contrary are wrong.

**1.** Article III standing is a "bedrock constitutional requirement that [the Supreme] Court has applied to all manner of important disputes." *United States v. Texas*, 599 U.S. 670, 675 (2023). It is "built on a single basic idea—the idea of separation of powers." *Id*. The requirement that plaintiffs demonstrate standing "helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system," *id*. at 675-76, by ensuring that federal courts do not become "forums for the ventilation of public grievances" more properly resolved through the democratic process, *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc*., 454 U.S. 464, 473 (1982).

To establish standing, plaintiffs "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). Plaintiffs also "must demonstrate standing for each claim" they seek to press "and 'for each form of relief sought,' even if the various claims are derived from similar facts or raise similar

19

legal questions." *Center for Biological Diversity*, 144 F.4th at 304 (D.C. Cir. 2025) (quoting *DaimlerChrysler Corp.*, 547 U.S. at 352). And the "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). These limitations work to ensure that federal courts do not sit to "exercise general legal oversight of the Legislative and Executive Branches" but instead redress concrete injuries to cognizable interests. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021).

Courts routinely enforce these limits by requiring plaintiffs to establish standing for every action that they challenge. For example, in a case challenging the approval of permits for oil and gas wells, the plaintiffs sought to challenge a group of permits "in the aggregate." *Center for Biological Diversity*, 144 F.4th at 300. This Court recognized, however, that because "each [permit] is a distinct agency action, plaintiffs must establish standing to challenge each," *id.* at 309, including by showing how each permit "contribute[d] to their injury in fact," *id.* at 305. This Court held that plaintiffs lacked standing because they had "not alleged whether or how the newly permitted wells will cause [their alleged] harms at the locations they identify as where they live, work, or travel." *Id.* at 305-06. The Court refused to relax these requirements merely because plaintiffs attempted to aggregate their claims: "The fact that Plaintiffs have elected to combine their claims against more than 4,000

[permits] into one case does not convert the separate permitting actions into a single federal agency action." *Id.* at 310.

The Supreme Court similarly has rejected attempts to "challenge a more generalized level of Government action" instead of "specifically identifiable Government violations of law." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568 (1992). Such a generalized approach presents "obvious difficulties insofar as proof of causation or redressability is concerned." *Id.* The Court has acknowledged the appeal of that approach from a plaintiff's perspective, especially one with institutional interests: The case-by-case adjudication of concrete disputes arising in concrete factual settings is "assuredly not as swift or as immediately far-reaching a corrective process as those interested in systemic improvement would desire." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990). Nonetheless, the Court has steadfastly insisted that programmatic challenges are "rarely if ever appropriate for federal-court adjudication." *Lujan*, 504 U.S. at 568. "In light of [the] overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, [courts] must put aside the natural urge to proceed directly to the merits of [an] important dispute and to 'settle' it for the sake of convenience and efficiency." *Raines*, 521 U.S. at 819-20. These principles prevent plaintiff from raising any challenges other than to its members' concrete contract-related actions.

21

It has not identified a cognizable injury that would enable it to bring any other type of challenge.

2.    Plaintiff is an organization of personal services contractors that is seeking to unwind the alleged "closure" of USAID. JA399-400. An organization like plaintiff can assert standing in two ways: (1) associational standing on behalf of its injured members or (2) organizational standing for an injury to itself. *See People for the Ethical Treatment of Animals (PETA) v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). Plaintiff claims both forms of standing, but each theory works at most for contract-related injuries. Br. 33-34.

a.    Start with associational standing, which plaintiff focuses on. Br. 33. An organization can sue on behalf of its injured members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024).

Plaintiff's members, however, have plausibly been injured only by the loss of their jobs. Plaintiff's evidence of its members' injuries all relates to lost "housing, schools, health insurance," and assignments abroad. Br. 23 (citing JA445-79). All of those supposed harms could only plausibly be traced to the loss of their jobs as contractors. In fact, plaintiff's operative complaint frames the harms in terms of

22

"[j]ob losses." JA228. And since the members' jobs are connected to their personal services contracts, their injuries are only traceable to the termination of those contracts. JA220-21, 225.

Indeed, plaintiff does not even contend that its members are injured in any other way, only relying on the fact "[t]hey lost their jobs" and simply declaring that this is "traceable" to the "dismantling of the agency" and that unwinding that action could redress their injuries by "likely returning at least some of them to their positions." Br. 33. Plaintiff does nothing, however, to trace these employment related injuries to anything other than the termination of their contracts. Despite complaining that defendants terminated building leases, impounded funds, cancelled aid grants, terminated other federal employees, and shutdown websites, plaintiff never traces those actions to the alleged injuries of its members. Br. 14-19, 33. As the district court ruled, plaintiff's members therefore "do not … have standing to challenge" those actions, because they "have alleged no concrete and particularized injuries flowing from those actions specifically." JA868. In short, plaintiff cannot leverage alleged contract-related injuries to its members to challenge anything other than those contract-related actions.

    **b.**    Plaintiff's claim for organizational standing is largely duplicative and fails for similar reasons. Br. 34. Organizational standing requires a "concrete and demonstrable injury" to its "core business activities," as a "mere setback to [the

23

organization's] abstract social interests is not sufficient." *PETA*, 797 F.3d at 1093. Nor is the "diversion" of resources in response to defendants' actions sufficient. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 391, 395 (2024). Plaintiff simply asserts that "Defendants' actions have threatened not just its mission but its very existence." Br. 34. The only evidentiary basis for this conclusory statement is that plaintiff had trouble regaining contact with its members for some period (a past injury at best) and must respond to increased "inquiries" from members. *Id.* (citing JA401-02). Those alleged harms are not the type of ongoing injuries that can justify sweeping injunctive relief. At best, the harms are momentary and relate to a voluntary diversion of resources to address concerns by members, not a concrete injury to a core business activity. *See Center for Biological Diversity*, 144 F.4th at 315. Claiming injury because of increased demand for one's services is odd to say the least. But even if those injuries are cognizable for plaintiff as an organization, the injuries all trace to its members' loss of employment due to the termination of their contracts. JA401-02. So once again, the harms, if any, all stem solely from contract-related injuries.

   **3.**    Plaintiff's principal contention is that it challenges the entire "dismantling" of USAID as a separation of powers violation, not just personnel actions. Br. 34. But plaintiff cannot "engage in 'artful pleading' to make an end-run around the strictures of Article III." *E.T. v. Paxton*, 41 F.4th 709, 717 (5th Cir. 2022).

24

Instead, "courts must consider plaintiffs' actual injury—not the labels plaintiffs put on that injury." *Id.* Plaintiff may want this case to be about more programmatic issues it sees with USAID, but it has not traced its members' contract injuries to every action taken by the government. *See Lujan*, 504 U.S. at 568; *Widakuswara II*, 2025 WL 1288817, at *3 (rejecting attempt to aggregate multiple agency actions into a single "dismantling" claim).

It is no wonder, then, that plaintiff spends much of its brief relaying the alleged harms to USAID, humanitarian efforts, and people abroad rather than its members or itself. *See* Br. 13-18, 23, 34, 57-58; JA226-29, 554-72. None of those claimed injuries is to plaintiff or its members. Plaintiff's interest in vindicating the separation of powers provides no basis for its sweeping claims, because "[a]ll citizens" share "an interest in the independence of each branch of Government." *Reservists Comm. to Stop the War*, 418 U.S. at 220, 226-27. This "generalized interest … is too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Id.*; *Valley Forge*, 454 U.S. at 482-83. And any such programmatic injury is not redressable, as it would require "interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of … administration, contrary to the more modest role Article III envisions." *DaimlerChrysler Corp.*, 547 U.S. at 346; *see also Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring).

25

**4.**     Plaintiff does not really contest that it or its members have suffered, at most, injuries related to their terminated contracts. JA228. Instead, plaintiff emphasizes the separation of powers and continues to attempt to bundle the contract terminations with other distinct actions and claim that its injuries stem from the "dismantling" of USAID generally, such that a remedy reversing that closure will redress its contract-related harms. Br. 33-36. Plaintiff mistakes the fundamental limitations on the remedial powers of Article III courts.

The district court's treatment of plaintiff's claims—requiring standing to challenge an agency action in order to seek relief from that action—was exactly right. JA865, 867-68. It is well established that a plaintiff must demonstrate standing for each form of relief it seeks. *Town of Chester*, 581 U.S. at 439. Plaintiff attempts to evade that rule by claiming that it is challenging a single agency action. But the APA does not permit that maneuver. Just as in *Widakuswara II*, plaintiff attempts to group together "a collection of many individual" agency actions "that cannot be packaged together and laid before the courts for wholesale correction under the APA." 2025 WL 1288817, at *3 (quoting *Lujan*, 497 U.S. at 893). The APA does not permit plaintiffs to conceptualize an agency action so broadly that remedying its claims would require courts "to exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004).

26

Nor was the decision in the March 28 email plaintiff cites (at 35) itself a discrete final agency action. An "abstract decision" by an agency does not amount to a final agency action. *Biden v. Texas*, 597 U.S. 785, 809 (2022). Instead, the decision must be implemented through "many individual actions," and it is *those* actions that constitute final agency actions under the APA. *Lujan*, 497 U.S. at 892-93. Plaintiff can challenge at most the discrete agency actions for which it has standing; it cannot extend the boundaries of Article III standing by aggregating discrete agency actions, only some of which it can challenge, into one. Plaintiffs must show standing to challenge each agency action from which they seek relief, and the APA forbids plaintiff's attempt to redefine the action as the supposed decision to dismantle USAID.

More generally, plaintiff's attempt to obtain remedies from agency actions that did not injure it or its members is contrary to fundamental principles of redress, which require that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73. Given the admittedly job-related and thus contract-related injuries at issue, a contract-based remedy to plaintiff's members would provide "complete relief." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). Plaintiff cannot reasonably argue otherwise.

Yet Plaintiff impermissibly seeks remedies which "are broader than necessary to provide complete relief to each plaintiff with standing." *Id.* (staying broader than

necessary injunctions). Plaintiff seeks to reverse USAID's "shutdown" through an order preventing the reorganization of USAID, transferring its functions, removing online access, withholding grant funds and requiring defendants to develop a plan to obligate the funds, maintain staffing, and reinstate all personal services contractors. Br. 24 (citing JA237-38). These remedies would go "far beyond, and thus would *not* redress," any contract-related injury that it or its members allegedly experienced. JA869. Plaintiff does not even attempt to explain why damages or reinstating personal services contracts would not provide complete relief to it and its members (which, as explained below, amounts to a contract-related claim). *Id.* Nor, on the other hand, does plaintiff ever explain how preventing the reorganization or transfer of USAID functions, requiring grants to be paid, and restoring websites would provide it or its members *any* relief at all. *Id.* Any "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."). Plaintiff's proposed programmatic judicial overhaul of USAID casts a much broader net than basic standing principles allow.

Plaintiff misleadingly argues that its sweeping request reflects a principle of "broad standing" in separation of powers cases. Br. 36-38. But plaintiff ignores that

*all* of those cases involved enjoining the specific government actions that injured the party. Unlike plaintiff's argument here, those cases were carefully attuned to the remedial issues plaintiff runs roughshod over. Start with *Youngstown Sheet & Tube Co. v. Sawyer*, which involved all steel mills seized by the President suing to stop the very action they claimed violated the separation of powers and injured them: their seizure. 343 U.S. 579, 583 (1952). The unlawful conduct and injury were one and the same, so stopping the seizure was the necessary relief for the injury. *Id.* In *INS v. Chadha*, the plaintiff was being deported only because of a legislative veto to his suspension of deportation, and he thus sought an injunction of that procedure to remedy his specific injury. 462 U.S. 919, 924-28 (1983) ("If the veto provision violates the Constitution, and is severable, the deportation order against Chadha will be cancelled."). In *Clinton v. City of New York*, the plaintiffs would have received money from a congressionally passed bill if the President did not use the line-item veto to excise budget items that benefited them. 524 U.S. 417, 426-28, 430-32 (1998). The plaintiffs challenged the validity of the line-item veto that deprived them of these benefits. *Id.* And in *Lucia v. Securities & Exchange Commission*, the plaintiff challenged the appointment of an administrative law judge who issued sanctions against him. 585 U.S. 237, 242 (2018). The remedy the Supreme Court

granted was tailored to the individual plaintiff's injury: "a new hearing before a properly appointed official." *Id.* at 251 (quotation omitted).[1]

In *Andrade v. Lauer*, plaintiffs lost their jobs and challenged the authority of the officials to issue a reduction in force. 729 F.2d 1475, 1494-95 (D.C. Cir. 1984). This Court made clear, however, that the plaintiffs could only challenge the validity of the RIFs that harmed them, as the de facto officer "doctrine would no doubt prevent plaintiffs from launching wholesale attacks on the actions of de facto officers" and "also counsels that great care be taken in granting relief to plaintiffs who succeed in attacking specific actions taken by government officials on the ground that the officials have no legal title to their office." *Id.* at 1500. Once again, the redress was narrowly tied to the actual injury. *Id.* Here, by contrast, plaintiff seeks sweeping redress directed at multiple actions related to USAID, not just remedying their employment injuries as in *Andrade*.

If anything, *Seila Law LLC v. Consumer Financial Protection Bureau* cuts decisively against plaintiff. 591 U.S. 197, 211 (2020). There, the relevant party was *defending* against a suit to enforce a subpoena and argued the subpoena was unenforceable because the unremovable director lacked authority to issue a subpoena. *Id.* The remedy Seila Law sought was "to deny the Government's petition

---

[1] Plaintiff also relies on *Axon Enterprise, Inc. v. Federal Trade Commission*, but that case addressed only statutory channeling, not standing or remedy. 598 U.S. 175, 188 (2023).

to enforce the civil investigative demand and dismiss the case," not complete structural reform of the agency. *Id.* at 232. Indeed, the Court refused to hold the entire agency unconstitutional because it found the removal restrictions severable and thus remanded to determine whether the subpoena was ratified and thus valid despite the constitutional concerns. *Id.* at 238. If anything, that careful attention to the remedy proves why plaintiff's requested relief is unmoored from its alleged injury and basic remedial standards. The same is true for *Collins v. Yellen*, where shareholders challenged an amendment adopted by a director with unconstitutional removal restrictions. 594 U.S. 220, 243 (2021). They sought only the return of money, not the destruction of the agency. *Id.* at 257. Even then, the Court remanded because it was not clear that absent the removal restriction the President would have removed the director, thus rendering the amendment void. *Id.* at 260. Once again, the Supreme Court has made clear that redress must be closely tied to the alleged injury and wrongful act. And to the extent any of those cases provided broader relief than was necessary, it is worth noting that these cases preceded *CASA*'s admonition that equitable remedies cannot be "broader than necessary to provide complete relief to each plaintiff with standing." 606 U.S. at 861.

The district court here correctly recognized that in all of those cases the plaintiffs had "sought (and won) the cessation, on constitutional grounds, of specific government actions against them, which unquestionably redressed their particular

injuries." JA868-69. Plaintiff's requested relief, by contrast, is completely unmoored from its alleged injuries. Plaintiff never explains how resigning leases, restarting grants, opening new websites, and rehiring other employees would in any way redress its alleged injuries. Only contract-related remedies will. Plaintiff calls this core point "formalistic at best" given its separation of powers concerns. Br. 38. The law is form, however, especially when it comes to jurisdiction. Indeed, plaintiff ignores that standing is core to the separation of powers, ensuring that courts resolve only cases and controversies. *See Alliance*, 602 U.S. at 378 ("standing is built on a single basic idea—the idea of separation of powers."). If anything, plaintiff is the one seeking to upend the separation of powers. Article III is clear: at most plaintiff and its members faced contract-related injuries, have standing to challenge only contract-related actions, and can obtain only remedies that are tailored to those harms.

### B. Plaintiff's Claims Are Subject To The Contract Disputes Act.

This Court, like the district court, may assume without deciding that plaintiff has standing to challenge concrete contracting actions, including stop-work orders and contract terminations. Plaintiff has failed to demonstrate a likelihood that those claims are not governed by the Contract Disputes Act and thus channeled to the Court of Federal Claims.

**1.** The APA provides a limited waiver of sovereign immunity for claims "seeking relief other than monetary damages." 5 U.S.C. § 702. But that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

One statute that limits APA relief is the Contract Disputes Act. The CDA applies to certain types of contracts with the Federal Government, including contracts for "the procurement of services." 41 U.S.C. § 7102(a)(2); *see also id.* § 7102(a) (defining covered contracts); *see, e.g.*, *Sys. Application*, 26 F.4th at 170 (applying CDA to a services contractor); *Lee*, 127 Fed. Cl. at 736 (personal service contract dispute heard in the Court of Federal Claims). "The CDA serves two related functions. First, it establishes an administrative system for disputes relating to federal procurement contracts … ." *United Aeronautical Corp.*, 80 F.4th at 1022. "Second, it waives sovereign immunity over actions 'arising under' that administrative system and vests exclusive jurisdiction over such claims in only two venues: (1) the Court of Federal Claims, 28 U.S.C. § 1491(a)(2); 41 U.S.C. § 7104(b)(1), and (2) agency boards of contract appeals. 41 U.S.C. §§ 7104(a), 7105." *Id.*

33

In particular, the CDA provides a procedure for resolving any "claim by a contractor … relating to a [procurement] contract." 41 U.S.C. § 7103(a)(1); *see, e.g.*, *Dai Glob. v. Adm'r of USAID*, 945 F.3d 1196, 1199-200 (Fed. Cir. 2019). Under the CDA, the "contractor [must] take recourse against the government's alleged breach by submitting *a written claim to the contracting officer* for a final decision prior to commencing suit." *Kellogg Brown & Root Servs., Inc.*, 856 F. Supp. 2d at 183 (quoting *Intrados/Int'l Mgmt. Grp.*, 277 F. Supp. 2d at 63). After a properly submitted CDA claim has been exhausted, the proper forum is either the Civilian Board of Contract Appeals, which has jurisdiction to decide any appeal from a decision of a contracting officer on a contract made by USAID or the Department of State, *see* 41 U.S.C. § 7105(e)(1)(B), or the United States Court of Federal Claims, 41 U.S.C. § 7104(b).

In sum, the CDA "established a comprehensive framework for resolving contract disputes between executive branch agencies and government contractors." *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 521 (D.C. Cir. 2010); *see also* 41 U.S.C. § 7103(a)(1) (requiring exhaustion for claims "relating to a contract"). "When the Contract Disputes Act applies, it provides the *exclusive* mechanism for dispute resolution." *Sherwood Van Lines*, 50 F.3d at 1017; *see United States v. J & E Salvage Co.*, 55 F.3d 985, 987 (4th Cir. 1995) ("The review

procedures under the [Contract Disputes Act] are exclusive of jurisdiction in any other forum.").

This Court has evaluated whether a claim is covered by the CDA by examining (1) "the source of the rights upon which the plaintiff bases its claim" and (2) "the type of relief sought (or appropriate)." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 76 (D.C. Cir. 1985) (citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982)).[2] *First*, to determine "the source of the rights upon which the plaintiff bases its claims," courts consider whether the "plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights 'exist prior to and apart from rights created under the contract,' and whether the plaintiff 'seeks to enforce any duty imposed upon' the government 'by the relevant contracts to which' the government 'is a party.'" *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (cleaned up). *Second*, the "type of relief sought" often turns on "whether the plaintiff effectively seeks to attain monetary damages." *Id.* at 1107-08. When a claim is premised on a

---

[2] The differing language of the CDA and the Tucker Act suggests that the Court should apply a distinct, broader, test for the applicability of the CDA. *Compare* 28 U.S.C. § 1346(a)(2) (claims "founded … upon" a contract), *with* 41 U.S.C. § 7103(a)(1) (claims "relating to" a contract); *see Todd Constr.*, 656 F.3d at 1312 (inquiring, for purposes of CDA, whether claim bears "some relationship to the terms or performance of a government contract")*; United Aeronautical Corp.*, 80 F.4th at 1030-31 (following *Todd Construction* test). That issue does not matter in this case, however, because the narrower Tucker Act test yields the same result here.

contract with the government, depends on the government's having breached that contract, and seeks to compel the government to pay sums due under the contract, it is a contract claim, not an APA claim. *See Megapulse*, 672 F.2d at 967-71.

As the district court correctly concluded, plaintiff's claims are channeled under this test, leaving the district court without jurisdiction to resolve them. As a result, plaintiff is unlikely to succeed on the merits. Both factors cut against plaintiff. As the district court rightly explained, plaintiff at most has Article III standing only because of its members' contracts with USAID, and it expressly seeks reinstatement of their contracts. JA883-86.

First, the source of rights. Plaintiff at most has standing because of its members' contract rights, so those rights are ultimately the source of its claims. JA883. And as the district court pointed out, it is noteworthy that plaintiff's "original complaint specifically averred that the … contracts include 'convenience to the agency' clauses, and complained that USAID failed to provide the 'minimum notice' required for termination under those clauses," and its amended complaint "omits but does not disavow those allegations." JA884. Plaintiff does not (now) expressly plead a breach-of-contract claim in as many words, of course. But the fact that a termination "also arguably violates certain other provisions of law does not transform the action into one based solely on those provisions." JA884 (quoting *Ingersoll-Rand*, 780 F.2d at 78) (alterations accepted). That is why *Ingersoll-Rand*

36

could collect cases holding that "where plaintiff was awarded [a] contract and [the] government terminated for convenience, [the] cause of action is on the contract despite plaintiff's allegations of statutory and constitutional violations." 780 F.2d at 78. Plaintiff's claims are no different.

Second, the relief plaintiff seeks cuts in favor of channeling. JA885-86. A plaintiff "may not sidestep" the Claims Court's jurisdiction by "avoiding a request for damages" when its requested relief "amount[s] to a request for specific performance." *Ingersoll-Rand*, 780 F.2d at 79-80; *Crowley*, 38 F.4th at 1107 (cautioning against "creative drafting of complaints … to avoid the jurisdictional consequences of the Tucker Act"). But that is what plaintiff seeks.

As explained already, the only remedies plaintiff even arguably has standing to assert are contract-related. In particular, its amended complaint requests an injunction sharply limiting the government's ability to "suspend, eliminate, consolidate, or downsize USAID, its workforce, or contracts" or "enforc[e] or giv[e] effect to termination notices sent to U.S. personal services contractors" after January 20, 2025. JA216. That is a demand for restoration of covered personal services contracts. And it is no different in effect from the even more explicit prayer in plaintiff's original complaint, which sought an order requiring defendants to "[r]eturn all [personal services contractors] to the terms and conditions of employment they enjoyed on January 19, 2025," barring defendants "from

37

terminating [personal services contracts] in effect on January 19, 2025, or allowing them to lapse" and requiring defendants to "[r]elease money to pay, and pay, [personal services contractors]," "consistent with the terms of their contracts." JA25-26.

The Supreme Court's order in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), confirms as much. There, the district court enjoined the government from terminating grants, effectively ordering the payment of money under the contracts. *Id.* at 968. The Supreme Court stayed that order, concluding that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* It emphasized that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" which the district court's order had, in effect, done. *Id.* So too here.

This Court reached the same conclusion in *Ingersoll-Rand*. There, the Air Force terminated a contract with Ingersoll-Rand and solicited new bids for the contract. 780 F.2d at 75-77. Ingersoll-Rand sued, arguing that the termination violated two federal regulations and was arbitrary and capricious under the APA, and sought an injunction requiring that its contract be reinstated. *Id.* at 77. This Court affirmed the dismissal of Ingersoll-Rand's suit, agreeing with the district court that Ingersoll-Rand's claims were in essence contract claims that belonged in the Court

of Federal Claims. *Id.* at 77-80. In so holding, this Court emphasized that Ingersoll-Rand's suit boiled down to whether the contract permitted termination under the circumstances and that the dispute was thus "entirely contained within the terms of the contract." *Id.* at 78. "That the termination also arguably violates certain other regulations d[id] not transform the action into one based solely on those regulations." *Id.* This Court further concluded that Ingersoll-Rand's request that the contract be reinstated "amount[ed] to a request for specific performance." *Id.* at 80.

Reinforcing all of this, a motions panel of this Court reached the same conclusion when it stayed a district court's preliminary injunction premised on a similar "agency dismantling" theory. *See Widakuswara v. Lake*, 2025 WL 1288817 at *2. The Court explained that "federal employees may not use the Administrative Procedure Act to challenge agency employment actions," including termination of personal services contracts." *Id.* The en banc court stayed a different portion of that decision, but it left that conclusion undisturbed.

**2.** Plaintiff's contrary arguments are unavailing. Plaintiff largely argues that its claims aren't essentially contractual, under the *Megapulse* test, because it pleads statutory and constitutional claims instead of contractual ones and because it does not seek money damages. That argument fails for three reasons.

First, it falls with plaintiff's standing arguments. Plaintiff has standing only to assert claims arising from and remedying the modification or termination of its

members' contracts. A plaintiff cannot circumvent statutory limits on district courts' jurisdiction by pleading claims that fall outside the bounds of Article III.

Second, plaintiff's claims are not genuinely constitutional. This Court recently rejected a similar attempt to "transform a statutory claim into a constitutional one to avoid limits on judicial review." *Global Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025). In *Global Health Council*, the plaintiffs invoked *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), to claim that the government violated the separation of powers by allegedly impounding funds contrary to the Impoundment Control Act. This Court rejected that framing and held that the dispute was "fundamentally statutory because the alleged constitutional violation is predicated on the underlying alleged statutory violations." *Global Health Council*, 153 F.4th at 15 n.11. This Court reasoned that *Youngstown* was "inapposite," explaining that "the 'only basis of authority asserted' in *Youngstown* 'was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces.'" *Id.* at 15 (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)). "*Youngstown* thus involved the conceded *absence* of *any* statutory authority, not a claim that the President acted in excess of such authority.'" *Id.* (quoting *Dalton*, 511 U.S. at 473). The Fourth Circuit recently reached the same conclusion, approvingly citing *Global Health Council*. *See Sustainability Inst. v. Trump*, -- F.4th --, 2026 WL 157120, at *8-10 (4th Cir. Jan. 21, 2026) (explaining

40

why plaintiffs' "attempt to cast their" similar "claims as constitutional, and not statutory, fails under Supreme Court precedent").

The same is true here. Plaintiff claims that the closure of USAID violates the separation of powers because of alleged constraints found in various statutory provisions. Any claims that alleged dismantling of USAID violates "the statutes that create the agency and require it to perform various mandatory tasks," or otherwise exceeds the authority given to the President in the Foreign Assistance Act or the Further Consolidated Appropriations Act of 2024, present only statutory issues.

Third, it makes no difference that plaintiff now disavows an intent to seek money damages. For one thing, plaintiff *did* seek payment of "back wages and covered expenses" incurred by personal services contractors in the operative complaint. JA26. And it would not matter even if plaintiff had foregone a request for money damages, for the reasons explained already. *See supra* pp. 36-39. A plaintiff cannot evade the contractual nature of an action by seeking an even broader remedy.

Shifting gears, plaintiff attempts to invoke the general test for determining whether a comprehensive statutory scheme impliedly forecloses a claim. Br. 43-46 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)). But there is no question that the CDA forecloses contract-related claims, nor do *Thunder Basin* and *Axon* supply

41

the relevant test for determining whether a claim is covered by the CDA. *See A&S Council Oil Co.*, 56 F.3d at 241 (CDA is "the paradigm" of a statute "that preempts more general jurisdictional provisions" like § 1331).

Even if the general test of *Thunder Basin* and *Free Enterprise Fund* were relevant here, it would not cut in plaintiff's favor. Plaintiff's argument (at 43-45) that it presses claims that are not of the type Congress meant to channel hinges on its arguments that it can challenge the "dismantling" of USAID as a general matter and that its claims are constitutional in nature, but those arguments fail for the reasons already explained. And constitutional claims, including separation-of-powers claims, do not fall outside the ken of the Court of Federal Claims. *See, e.g.*, *Hazlehurst v. Secretary of Health & Human Servs.*, 177 Fed. Cl. 479 (2025) (constitutionality of National Childhood Vaccine Injury Act); *Campo v. United States*, 169 Fed. Cl. 502 (2024) (Fifth Amendment takings claims); *Nationsbank of Tex. v. United States*, 44 Fed. Cl. 661 (1999) (constitutionality of retroactive tax legislation).

Plaintiff also contends that its claims are not channeled to the Claims Court because that court cannot grant it sweeping equitable relief or a preliminary injunction on its claims as presently pleaded. Br. 44. But that inference does not follow. A limitation on a remedy does not mean that Congress did not intend to channel its claims to the Claims Court. "[I]t is the comprehensiveness of the statutory

42

scheme involved, not the adequacy of specific remedies thereunder," that precludes district court jurisdiction. *AFGE v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019) (*AFGE II*) (quoting *AFGE v. Sec'y of Air Force*, 716 F.3d 633, 638 (D.C. Cir. 2013) (*AFGE I*)). That is why courts, including this Court, have repeatedly rejected this kind of argument. *See United States v. Fausto*, 484 U.S. 439, 455 (1988) (CSRA precluded employee's suit for backpay despite unavailability of CSRA review); *Sustainability Inst.*, -- F.4th at --, 2026 WL 157120, at *7 n.7 ("[T]he fact that the Tucker Act does not allow the specific relief Plaintiffs seek does not mean that their claims must proceed under the APA; rather, it shows that Congress made the dispositive choice for contract claims against the United States to be limited to certain money damages"); *AFGE I*, 716 F.3d at 639 ("Nor may a party avoid the CSRA because it provides only an 'inconvenient' remedy[.]"); *Filebark*, 555 F.3d 1009, 1014 (D.C. Cir. 2009) ("These procedures surely lack the directness and immediacy of an APA suit, and the controllers have apparently found them frustrating. But the choice of procedures lies with Congress.").

Nor would the limits on Claims Court relief that plaintiffs posit in any way foreclose meaningful judicial review. Br. 44. "[A]n opportunity for meaningful judicial review remains available within a special statutory scheme so long as the claims at issue 'can eventually reach an Article III court fully competent to adjudicate them.'" *Federal Law Enforcement Officers Ass'n v. Ahuja*, 62 F.4th 551,

43

562 (D.C. Cir. 2023) (citation omitted). Even if its claims are channeled, plaintiff will eventually reach the Federal Circuit, which is "an Article III court fully competent" its claims. *Id.* A plaintiff cannot circumvent the limits of a comprehensive statutory scheme whenever a district court could "more efficiently adjudicate" its claim. *AFGE I*, 716 F.3d at 639; *see Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (limitations in comprehensive channeling statutes apply equally to a "'systemwide challenge' to an agency policy," just as they apply to "the implementation of such a policy in a particular case"). In sum, "the Supreme Court has 'made clear' that the mere 'expense and disruption of protracted adjudicatory proceedings on a claim do not justify immediate review.'" JA881 (quoting *Axon*, 598 U.S. at 192). There is no risk that plaintiff will be unable to obtain meaningful judicial review of the only claims it plausibly has standing to assert, even if those contract-related claims are channeled.

Plaintiff argues that the Supreme Court's resolution of the claims in *National Institutes of Health v. American Public Health Association* ("*NIH*") favors its position, but that is incorrect. Br. 46-47 (citing 145 S. Ct. 2658 (2025)). Whether or not challenges to a policy regarding grant terminations belong in district court or in the Court of Federal Claims, plaintiff's requested preliminary injunction expressly sought reinstatement of its members' personal services contracts. JA237-38 (requesting a preliminary injunction barring defendants from "enforcing or giving

44

effect to termination notices sent to USAID personal services contractors," as well as other contract-related relief). Plaintiff's claims are decidedly on the contractual side of the *NIH* line.

## II.   Plaintiff Failed to Establish the Remaining Preliminary Injunction Factors.

Likelihood of success on the merits, especially jurisdiction, is necessary for a preliminary injunction. *See Food & Water Watch, Inc.*, 808 F.3d at 913. Since plaintiff has not demonstrated a likelihood of success, this Court should "not [] proceed to review the other three preliminary injunction factors." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019). If this Court concludes that it has standing and jurisdiction to hear plaintiff's claims, however, the Court should remand the case for the district court to address the merits in the first instance and rebalance the factors. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 304 (remanding rather than addressing the remaining factors). Regarding the merits, the district court did not reach the numerous issues raised by the parties because it found no jurisdiction. Plaintiff's brief treatment of the merits here is no basis for this Court to decide these complicated and significant issues in the first instance. *Compare* Br. 49-55 *with* ECFs 39-1 at 29-37; 45 at 17-40. And because the other preliminary injunction factors are inherently tied to likelihood of success, the district court should have a chance to rebalance them after addressing the merits. In any event, the remaining factors favor defendants.

**1.** Start with irreparable harm, as a "movant's failure to show any irreparable harm is grounds for refusing to issue a preliminary injunction, even if the other three factors merit such relief." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025) (cleaned up). Irreparable harm is a "high standard," as the injury "must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985) (per curiam)). The district court correctly concluded that plaintiff failed to meet this high bar. JA887.

Plaintiff incorrectly contends that the district court applied the wrong standard by saying the harm must "certain, great, actual, and imminent" because the point of a preliminary injunction is to prevent the harm. Br. 56-60. That standard has been reiterated by this Court for the point that an irreparable harm must be "concrete" and "imminent" and to emphasize the high standard, not to say that the injury must have already been completed. *Clevinger*, 134 F.4th at 1234. Again, the *only* injuries to plaintiff or its members are related to "[l]oss of government employment [which] generally does not constitute irreparable harm." *Widakuswara*, 2025 WL 1288817, at *5 (quoting *Sampson v. Murray*, 415 U.S. 61, 83-84, 91-92 & n.68 (1974)). That is especially true here where plaintiff's members can seek redress for their actual injuries through the Contract Disputes Act. *Id.* Indeed, this Court found no irreparable harm to personal-service contractors in a nearly identical agency

"shutdown" case for the same reasons. *Id.* And the district court was well within its discretion to reject plaintiff's unsupported contention that its members could not find similar jobs, thus constituting an irreparable harm. JA887-88. More broadly, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a" preliminary injunction "are not enough." *Va. Petrol. Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958). So plaintiff's vague claim of diversion of resources to address increased inquiries from members cannot suffice either.

Plaintiff says that USAID cannot easily be put back together, so the district court was wrong not to preserve it. Br. 58-60. The district court was well aware that plaintiff sought a preliminary injunction to prevent the alleged shutdown of USAID, but correctly ruled that there was no irreparable harm to *plaintiff and its members*, whose only cognizable injuries were contract-related job losses. JA887-88. Generalized harms to USAID, humanitarian organizations, the separation of powers, or international efforts are irrelevant for this factor, as the irreparable harm must be to the *movant*, not others. *See* JA888; *Winter*, 555 U.S. 7, 22 (2008) (noting that "the applicant" must be "likely to suffer irreparable harm before a decision on the merits"); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 755 (10th Cir. 2024) ("a mere generalized separation of powers violation, by itself, does not

47

establish irreparable harm").[3] If the rule were otherwise, it would collapse irreparable harm with the public interest.

    **2.**    The remaining factors also favor defendants. When the government is a party, the public interest and equities "merge." *Nken*, 556 U.S. at 435. As this Court has already explained in a similar agency "shutdown" case, "depriving the Executive Branch of control over the individuals involved in its international" outreach and aid "threatens its prerogative to 'speak with one voice' on behalf of the United States in foreign affairs." *Widakuswara*, 2025 WL 1288817, at *5-6 (citing *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015)).

    If anything, plaintiff's asserted public interests highlight the serious harms to the government and thus the public interest. Plaintiff would require the Executive Branch to rehire thousands of employees, station many of them abroad with protections, restart foreign aid grants, and much more. JA237-38. That interposes courts into key foreign affairs decisions, a core Executive function. *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319-20 (1936). The public has an interest in ensuring that tax dollars are not spent on foreign aid projects that are not "aligned with American interests and in many cases antithetical to American

---

[3] Plaintiff's argument that it would now be more difficult to "fully restore" USAID certainly does not favor entering a preliminary injunction now. Br. 58-60. If anything, plaintiff's argument would mean that the equities weigh more heavily against plaintiff and underscore that the Court should remand to the district court if it believes there is standing and jurisdiction.

values," and that "serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *See* Exec. Order No. 14,169, § 1. So unwinding the recall of employees and reinstating billions in terminated grants poses serious foreign affairs implications that are not within the ken of federal courts.

Plaintiff's other argument is that illegally shutting down USAID is contrary to the public interest and cannot harm the government. Br. 61. But this assumes the merits that the district court did not reach and this Court should not resolve. *See Widakuswara*, 2025 WL 1288817, at *5-6. More importantly, it ignores the separation of powers interest in standing and Congress's equally valid interest in channeling contract claims like plaintiff's and its members'. *Id.*

At bottom, plaintiff cannot establish likelihood of success or an irreparable harm because its only plausible injuries are contract-related, so the Court need not reach these factors at all. But if they are considered at this stage, they still favor defendants—or, as the district court found, they at least do not tip the scales. JA889.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

JEANINE PIRRO
*United States Attorney*

SARAH WELCH
*Counsel to the Assistant Attorney General*

/s/ Tiberius Davis
TIBERIUS DAVIS
*Counsel to the Assistant Attorney General*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202)-514-4357*
*Tiberius.Davis@usdoj.gov*

January 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,550 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Tiberius Davis*
Tiberius Davis
*Counsel to the Assistant Attorney*
*General*

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Tiberius Davis*

Tiberius Davis
*Counsel to the Assistant Attorney General*