[ORAL ARGUMENT SCHEDULED FOR APRIL 23, 2026]

**No. 25-5291**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

PERSONAL SERVICES CONTRACTOR ASSOCIATION
*Plaintiff-Appellant*,

v.

DONALD TRUMP, ET AL.
*Defendants-Appellees.*

———————————————

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-469 (Hon. Carl J. Nichols)

———————————————

**APPELLANT'S REPLY BRIEF**

———————————————

JOSHUA KARSH
*Mehri & Skalet PLLC*
*2000 K St., NW, Ste. 325*
*Washington, D.C. 20006*
*jkarsh@findjustice.com*
*(773) 505-7533*

MARNI WILLENSON
*Willenson Law, LLC*
*3420 W. Armitage Ave., Ste. 200*
*Chicago, IL 60647*
*(312) 546-4910*

CAROLYN E. SHAPIRO*
*Schnapper-Casteras PLLC*
*200 E. Randolph St., Ste. 5100*
*Chicago, IL 60601*
*(773) 520-7533*

*Member of the Illinois bar with a D.C.
practice limited to federal litigation.
Not a member of the District of
Columbia bar.*

*Counsel for Plaintiff-Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

As required by Circuit Rules 27(a)(4) and 28(a)(1), counsel for Appellant Personal Services Contractor Association provides the following information:

### A.   Parties and Amici Appearing Below

In the district court, *Plaintiff-Appellant* was the Personal Services Contractor Association.

In the district court, *Defendant-Appellees* were: Donald Trump, President of the United States; the U.S. Department of State; the U.S. Agency for International Development (USAID); Marco Rubio, Secretary of State and Acting Administrator of USAID; Jeremy Lewin, Deputy Administrator and Chief Operating Officer of USAID; the Office of Management and Budget (OMB); Russell Vought, OMB Director; the United States DOGE Service, f/k/a the United States Digital Service; U.S. DOGE Temporary Service, a/k/a the "Department of Government Efficiency"; the Department of Government Efficiency; the U.S. Department of Treasury; and Scott Bessent, Secretary of the Treasury.

In the district court, the Constitutional Accountability Center was an amicus curiae.

### B.   Parties and Amici Appearing in this Court

In this Court, *Plaintiff-Appellant* is the Personal Services Contractor Association.

In this Court, *Defendant-Appellees* are: Donald Trump, President of the United States; the U.S. Department of State; the U.S. Agency for International Development (USAID); Marco Rubio, Secretary of State and Acting Administrator of USAID; Jeremy Lewin, Deputy Administrator and Chief Operating Officer of USAID; the Office of Management and Budget (OMB); Russell Vought, OMB Director; the United States DOGE Service, f/k/a the United States Digital Service; U.S. DOGE Temporary Service, a/k/a the "Department of Government Efficiency"; the Department of Government Efficiency; the U.S. Department of Treasury; and Scott Bessent, Secretary of the Treasury.

In this Court, *amici curiae* are: The Constitutional Accountability Center and Physicians for Human Rights, Dr. Dvora Joseph Davey, Dr. Salim S. Abdool Karim, and Mary Doe – appearing in support of Plaintiff-Appellant and reversal.

### C.  Rulings Under Review

The ruling under review in this case is the July 25, 2025 Memorandum Opinion and Order of the U.S. District Court for the District of Columbia (Judge Carl J. Nichols), denying Plaintiff-Appellant's motion for a preliminary injunction. JA853, 854-90. There are no official reporter citations for the opinion and order, but the opinion is available on Westlaw at 2025 WL 2097574.

### D.  Related Cases

This case has not previously been before this Court or any other court (other than the district court). There are several related pending cases involving similar issues within the meaning of D.C. Circuit Rule 28(a)(1)(C):

- *American Fed'n of Government Employees v. Trump*, No. 25-cv-352 (D.D.C.), currently before this Court as Appeal No. 25-5290.

- *AIDS Vaccine Advoc. Coalition v. U.S. Department of State*, No. 25-cv-400 (D.D.C.) and *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C.), currently before this Court as consolidated Appeals Nos. 25-5317 and 25-5319, and previously before this Court as consolidated Appeals Nos. 25-

5046 and 25-5047, 2025 WL 621396 (D.C. Cir. Feb. 26, 2025), and Nos. 25-5098 and 25-5097, 153 F.4th 1 (D.C. Cir. 2025).

• *J. Does 1-26 v. Musk*, No. 8:25-cv-462 (D. Md.), also before the Fourth Circuit as Appeal No. 25-1273.

February 19, 2026

Respectfully submitted,

*/s/ Joshua Karsh*
One of the Counsel for Plaintiff-Appellant

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.......... i

TABLE OF CONTENTS ................................................................. v

TABLE OF AUTHORITIES.......................................................... vii

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................1

ARGUMENT.................................................................................6

    I.    The PSCA has standing to challenge Defendants' dismantling of USAID ................................................................6

        A.    The PSCA has both associational and organizational standing.................................................................6

            1.  Associational standing.............................................6

            2.  Organizational standing..........................................7

        B.    *Collins and Andrade* foreclose the Government's standing theory.................................................................8

        C.    The Government's reliance on *Schlesinger* and generalized grievance cases is misplaced ........................................10

        D.    The Government's reliance on *Lujan* and *Center for Biological Diversity* is misplaced ....................................11

        E.    The Government conflates standing with the scope of available relief .........................................................15

        F.    The Government's APA finality argument does not defeat standing.................................................................18

        G.    The Government's standing theory would place unlawful executive action beyond judicial review ..........................19

II.   The Contract Disputes Act does not divest the district court of jurisdiction ...............................................................20

    A.   The PSCA's claims are not "at their essence" contractual.................................................................22

    B.   The PSCA does not seek contract-type remedies.....................24

    C.   The PSCA's claims fall outside the class of disputes the CDA was enacted to govern ........................................26

    D.   *NIH v. APHA* confirms that claims like the PSCA's belong in district court ................................................27

    E.   *Dalton v. Specter* does not bar jurisdiction over claims challenging unconstitutional executive action.........................28

III.  The equitable factors overwhelmingly favor preliminary injunctive relief ......................................................29

    A.   Defendants' dismantling of USAID inflicts irreparable harm on the PSCA and its members ......................................30

    B.   The Government has no cognizable interest in continuing conduct that exceeds its statutory and constitutional authority ...........................................................32

    C.   Absent preliminary relief, the Government's theory would render unlawful executive action effectively unreviewable ......................................................33

CONCLUSION ...................................................................34

CERTIFICATE OF COMPLIANCE .................................................36

CERTIFICATE OF SERVICE .....................................................37

vi

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpine Sec. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024) ........................................................26

*Andrade v. Lauer*,
729 F.2d 1475 (D.C. Cir. 1984)...................................8, 10, 11, 15, 17

*Axon Enter. Co. v. FTC*,
598 U.S. 175 (2023).................................................................21, 26, 27

*Bennett v. Kentucky Dep't of Educ.*,
470 U.S. 656 (1984)...............................................................................22

*Bennett v. Spear*,
520 U.S. 154 (1997)...............................................................................18

*Biden v. Texas*,
597 U.S. 785 (2022) ..............................................................................18

*Bond v. United States*,
564 U.S. 211 (2011)..................................................................................9

*Bowen v. Mass.*,
487 U.S. 879 (1988)...............................................................................27

*Center for Biological Diversity v. United States Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) .....................................................12, 15

*Collins v. Yellen*,
594 U.S. 220 (2021)....................................................................2, 8, 9, 15

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) ......................................................21, 24

*Center for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015).................................................................7

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006)....................................................................................14

*Dalton v. Specter,*
   511 U.S. 462 (1994)........................................................................28, 29, 30

*Dep't of Education v. California,*
   604 U.S. 650 (2025)....................................................................................23

*Free Enter. Fund v. PCAOB,*
   561 U.S. 477 (2010)........................................................................21, 27, 29

*Global Health Council v. Trump,*
   153 F.4th 1 (D.C. Cir. 2025) ......................................................................29

*Hunt v. Washington State Apple Adver. Comm'n,*
   432 U.S. 333 (1977)......................................................................................7

*INS v. Chadha,*
   462 U.S. 919 (1983)......................................................................................9

*Ingersoll-Rand Co. v. United States,*
   780 F.2d 74 (D.C. Cir. 1985)......................................................................23

*J.G.G. v. Trump,*
   No. 25-5217, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025) ...........................34

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016)......................................................................7, 32

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)................................................................................7, 12, 15

*Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.,*
   763 F.2d 1441 (D.C. Cir. 1985) ..................................................................22

*Megapulse, Inc. v. Lewis,*
   672 F.2d 959 (D.C. Cir. 1982).......................................................21, 22, 24, 25

*Morrison v. Olson,*
   487 U.S. 654 (1988)....................................................................................20

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023)...................................................29

*National Ctr. for Mfg. Sciences v. United States*,
    114 F.3d 196 (Fed. Cir. 1997) ................................................23

*National Insts. of Health v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025)........................................................27, 28

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ................................................24

*Royal Canin U.S.A., Inc. v. Wullschleger*,
    604 U.S. 22 (2025)..................................................................25

*Sampson v. Murray*,
    415 U.S. 61 (1974).................................................................31

*Schlesinger v. Reservists Comm. to Stop the War*,
    418 U.S. 208 (1974)...............................................................11

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994)..........................................................26, 27

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992).........................................21, 24, 25

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006).................................................29

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025)...............................................................17

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016)...............................................................19

*Webster v. Doe*,
    486 U.S. 592 (1988)...............................................................27

*Widakuswara v. Lake*,
    779 F. Supp. 3d 10 (D.D.C. 2025), appeal pending, No. 25-144................17

ix

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................4

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ..................................................................4

**Statutes**

Contract Disputes Act ...............................................................1, 3, 20

**Other Authorities**

U.S. Const. art. I, § 6, cl. 2 ......................................................11

**GLOSSARY**

| | |
|---|---|
| CDA | Contract Disputes Act (41 U.S.C. §§ 7101–09) |
| PSCA | Personal Services Contractor Association |
| SFOPS | Department of State, Foreign Operations, and Related Programs |
| USAID | United States Agency for International Development |

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Government asks this Court to accept a remarkable proposition: that the Executive may dismantle a congressionally created agency, USAID, refuse to spend billions of dollars that Congress appropriated to it, and yet place that decision beyond judicial review.

The Government does not meaningfully defend the legality of its conduct. Instead, it identifies three supposed barriers that foreclose review. The first is "basic Article III standing principles." The Government claims they sharply constrain injured parties from invoking the judicial power to enforce the Constitution's separation of powers. The second is the Contract Disputes Act. The Government reads the CDA as precluding district court review by requiring virtually any claim by a plaintiff who has or had a procurement or services contract with the Government to proceed through contract-dispute mechanisms—on the theory that, but for the contract, the plaintiff would never have been injured. The third is the President's asserted interest in "taking decisive action in the realm of foreign affairs," which the Government invokes both to deny Congress's control over foreign-aid spending and to place decisions nullifying congressionally mandated programs beyond judicial scrutiny. Gov't Br. 1–3. None of those

1

contentions can be reconciled with the Constitution's text, structure, or history—or with the CDA.

Start with standing. The Government's standing argument rests on a fundamental misunderstanding of separation-of-powers guarantees and controlling precedent. Article I vests Congress—not the Executive—with the power of the purse. Article II obligates the President to faithfully execute the laws Congress has enacted, not to nullify them or dismantle the institutions Congress created to carry them out. And Article III vests the Judiciary with the authority and responsibility to enforce those structural limits.

As the Supreme Court has explained, these structural protections are "designed to preserve the liberty of all the people." *Collins v. Yellen*, 594 U.S. 220, 245 (2021). And consistent with that design, they are enforceable by "any aggrieved party" who suffers injury-in-fact fairly traceable to their violation. *Id.* The PSCA and its members easily satisfy that standard. They suffered concrete injury when Defendants dismantled USAID, eliminating their jobs; their injury is directly traceable to Defendants' unlawful conduct; and it is redressable by judicial relief restoring Defendants' compliance with governing statutes and constitutional limits. Article III

2

requires nothing more. The Government's contrary theory is not a limitation on standing. It is a claim of executive immunity from the Constitution.

The Government's reliance on the Contract Disputes Act fares no better. Plaintiffs do not seek to enforce contractual rights or recover contractual remedies. They seek to halt unconstitutional, illegal, and ultra vires executive action dismantling a federal agency and nullifying statutory mandates, and nothing in the CDA strips district courts of jurisdiction to decide whether the Executive has exceeded its constitutional and statutory authority. Accepting the Government's theory would allow the Executive to evade district court review whenever its unlawful actions disrupt contractual relationships. Nothing in the CDA authorizes such a sweeping transfer of constitutional adjudication away from district courts.

Nor can the Government escape judicial review by invoking foreign affairs. The President's foreign affairs authority does not include the power to disregard statutes or refuse to spend appropriated funds. Congress established USAID as an independent agency and appropriates funds for its operation. The Executive cannot nullify those statutory mandates by invoking foreign affairs any more than President Truman could seize steel

3

mills by invoking national security. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–89 (1952). To the contrary, when the Executive defies Congress's express commands, its authority is "at its lowest ebb." *Id.* at 637–38 (Jackson, J., concurring). "The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015).[1]

Finally, the Government's defense of the district court's rulings on irreparable harm and the public interest rests on two flawed premises: first, that dismantling a federal agency inflicts no irreparable harm; and second, that the Executive's policy preferences may override Congress's statutory mandates. Neither premise is correct.

The harm here is irreparable because allowing the Executive to continue dismantling USAID during the pendency of this case may threaten the scope of meaningful corrective relief later. The more the

---

[1] The Government's brief (at 6–9) significantly misstates the Executive's supposed control over foreign aid. Foreign aid is not an Article II power; it is an exercise of Congress's spending power, and Congress often imposes detailed, mandatory foreign-aid appropriations by country, sector, and program, leaving the Executive with discretion, at most, over how but not whether to carry out those appropriations—and even that discretion is tightly constrained by notification, reprogramming, and consultation requirements. SFOPS §§ 7015, 7062, 7063; Opening Br. 7–11.

agency is dismantled, the harder it becomes for a court to order the pieces put back together again. Dismantling of institutions inflicts irreparable harm because the damage compounds over time and may become impossible to fully undo.

At the same time, the balance of equities and the public interest likewise overwhelmingly favor interim relief. Congress mandated USAID's existence and independence and appropriated funds for foreign aid for specific purposes, and the Executive has no cognizable interest in defying those mandates. By contrast, the public has a profound interest in ensuring that the Executive complies with duly enacted statutes and respects the constitutional allocation of powers and the rule of law.

At bottom, the Government's position would make the Constitution's structural limits optional—binding only when the Executive chooses to respect them and unenforceable when it does not. That is not the Constitution the Framers wrote. Judicial review exists precisely to ensure that when the Executive exceeds its lawful authority, those injured by its actions may invoke the Judiciary's protection.

This Court should reverse.

5

## ARGUMENT

### I. The PSCA has standing to challenge Defendants' dismantling of USAID.

When Defendants dismantled USAID, the PSCA and its members suffered concrete, particularized injuries. Those injuries are directly traceable to Defendants' destruction of the agency. And they are redressable through declaratory and injunctive relief restoring Defendants' compliance with statutory and constitutional requirements. Article III standing requires nothing more.

#### A. The PSCA has both associational and organizational standing.

##### 1. *Associational standing*

The PSCA plainly satisfies the requirements for associational standing. Its members' job losses are concrete injuries directly traceable to Defendants' dismantling of USAID, which eliminated their jobs. And they are redressable through declaratory and injunctive relief requiring Defendants to comply with governing statutes and constitutional limits.

The remaining associational-standing requirements are equally satisfied. The claims asserted and relief sought are germane to the PSCA's organizational purpose of vindicating its members' interests. And neither

the claims nor the requested relief require the participation of individual members. That is all Article III requires. See *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342–43 (1977); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Center for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015); Opening Br. 33–34.

The Government does not meaningfully contest these elements. Nor could it.

### 2. *Organizational standing*

The PSCA also has organizational standing—because Defendants' actions have frustrated its mission and threatened its continued viability. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

That is precisely what occurred here. The PSCA exists to represent USAID personal services contractors. If USAID is dismantled, the PSCA's reason for existence disappears with it. The institutional harm to the PSCA is thus not a mere "voluntary diversion" of resources, as the government suggests, Gov't Br. 24, but an existential injury. Nor is that injury "momentary." *Id.* It threatens the PSCA's extinction.

\* \* \* \* \*

Because Article III's standing requirements—injury, causation, and redressability—are not subject to meaningful dispute here, the Government resorts to a more extreme theory. It contends that the PSCA and its members have standing "at most" to challenge individual "contract terminations"—but not the antecedent decision to dismantle the agency that caused those terminations. Gov't Br. 3, 14–15, 19, 22–32. That theory cannot be reconciled with *Collins v. Yellen*, 594 U.S. 220 (2021), which the Government mentions only in passing (Br. 31), or with *Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984).

**B.  *Collins and Andrade* foreclose the Government's standing theory.**

Separation-of-powers claims are subject to ordinary—not heightened—Article III requirements. Plaintiffs with concrete injuries caused by separation-of-powers violations have standing to challenge those violations.

The Supreme Court expressly confirmed as much in *Collins v. Yellen*, where shareholders of Fannie Mae and Freddie Mac challenged executive action that had depleted the companies' capital and eliminated shareholders' dividends. The shareholders asserted that, because those

8

actions were taken by an Executive Branch official not removable by the President, they violated separation-of-powers principles. *Collins*, 594 U.S. at 235–36 & n.11. The Supreme Court sustained those claims.

In doing so, the Supreme Court emphasized that the Constitution's separation-of-powers limits are designed to preserve "the liberty of all the people" and to protect rights "shared by everyone in this country." *Id.* at 245. Consistent with that principle, "any aggrieved party" with an injury traceable to a separation-of-powers violation may therefore file a separation-of-powers claim to redress it. 594 U.S. at 245. That rule reflects settled precedent. See *Bond v. United States*, 564 U.S. 211, 223 (2011) ("If the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justifiable injury may object."); *INS v. Chadha*, 462 U.S. 919, 935–36 (1983) (holding that injury-in-fact and redressability establish Article III standing and rejecting the contention that Chadha lacked standing "because a consequence of his prevailing will advance the interests of the Executive Branch in a separation of powers dispute with Congress").

9

This Court reached the same conclusion in *Andrade*. There, the Government argued—much as it does here—that federal employees challenging a reduction-in-force lacked standing to assert separation-of-powers claims because they had suffered "no particularized" constitutional injury. *Andrade*, 729 F.2d at 1494. This Court rejected that argument, holding that the employees had suffered a classic Article III injury: "they lost their jobs." *Id.*

In short, when executive action eliminates federal employees' jobs through a decision the Executive had "no constitutional authority to carry out," the resulting injury is "direct," "concrete," "particularized," and fully sufficient to establish the employees' Article III standing to challenge their terminations on constitutional grounds. *Andrade*, 729 F.2d at 1494–95. See also 594 U.S. at 245. The same is true here. Defendants dismantled USAID. As a result, PSCA members lost their jobs. Article III requires nothing more.

## C. The Government's reliance on *Schlesinger* and generalized grievance cases is misplaced.

Contrary to the Government's suggestion, the PSCA's claims are not prohibited "generalized grievances" indistinguishable from the interest

shared by all citizens in the independence of each branch of government. Gov't Br. 25 (citing *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974)).

In *Schlesinger*, the Supreme Court denied standing to plaintiffs who alleged that Members of Congress violated the Incompatibility Clause, U.S. Const. art. I, § 6, cl. 2, by serving as Reserve officers while in office. 418 U.S. 208 (1974). The Court held that the plaintiffs had suffered no concrete personal injury. They had only the same "generalized" interest in constitutional compliance shared by all citizens. *Id.* at 217. But as this Court explained in *Andrade*, that circumstance bears no resemblance to cases in which federal employees challenge executive action eliminating their jobs: unlike the plaintiffs in *Schlesinger*, terminated employees suffer a direct, concrete, and personal injury—loss of their employment—which is fully sufficient to support Article III standing. *Andrade*, 729 F.2d at 1494–95.

### D. The Government's reliance on *Lujan* and *Center for Biological Diversity* is misplaced.

The Government mischaracterizes this lawsuit as a "programmatic" challenge cobbled together from discrete agency decisions. Gov't Br. 1. It is not. This case challenges a single, categorical executive decision: the

dismantling of USAID. Defendant Jeremy Lewin's agency-wide memorandum, tellingly titled "USAID's Final Mission," confirms that Defendants executed a unified plan to dismantle the agency and—"[a]s part of that process"—eliminate substantially all USAID jobs. JA260. By Defendants' own account, eliminating the workforce was integral to dismantling the agency. *Id.*

The PSCA's claims bear no resemblance to the "aggregate," "systemic," "programmatic" challenges in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), or *Center for Biological Diversity v. United States Dep't of the Interior*, 144 F.4th 296 (D.C. Cir. 2025). See Gov't Br. 20–21. In those cases, the plaintiffs attempted to challenge broad regulatory "programs" by stitching together thousands of individual licensing or permitting determinations. Here, the aggregation was done by the Government itself. Defendants made a unified decision to dismantle USAID and terminate its workforce. JA 259-62.[2] The PSCA challenges that discrete executive action—not a collection of discretionary decisions assembled for purposes of litigation.

---

[2] See also JA340–42, 376–82, 462–470, 690, 693–94, 697, 709, 712, 714, 723, 728–29, 747, 749, 751–55, 757–61, 764, 767.

The Government's repeated criticisms of the PSCA for citing evidence of "grant terminations, website closures, and lease transfers," Gov't Br. 12, 15, 19, 23, 28, 32, only underscore this point. That evidence was not offered to manufacture standing by aggregating unrelated agency actions. The PSCA's standing rests on the concrete injuries suffered by its members and the Association itself, including the loss of employment and the dismantling of the agency that employed them.

The additional evidence instead demonstrates the scope, pace, and finality of Defendants' dismantling of USAID. It bears directly on the irreparable harm, equities, and public-interest factors governing interim relief, and it confirms that Defendants did not merely take a series of discrete, discretionary actions, but executed a unified plan to eliminate USAID as a functioning institution. This evidence therefore reinforces— rather than undermines—the conclusion that this case challenges a single, categorical executive decision.

The Government cannot recharacterize its own categorical dismantling of USAID as a "programmatic" abstraction to evade judicial review. Nor does the scope of the relief requested here undermine standing. When the Executive dismantles an entire agency, restoring the status quo necessarily

13

operates at a similar scale—not because the PSCA seeks judicial supervision of the "wisdom and soundness" of "everything done by an administrative agency" but because Defendants' conduct itself eliminated USAID wholesale. *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 346 (2006); Gov't Br. 25.

The Government's contrary argument rests on its misreading of paragraph (f) of the PSCA's preliminary injunction motion as if it sought specific performance of personal-services contracts. Gov't Br. 37–39. It does not. Paragraphs (e) and (f) of that motion operate together to seek an order requiring Defendants to develop and implement a plan to obligate congressionally appropriated funds and maintain staffing sufficient to carry out USAID's statutory functions—and, *pending their compliance*, to refrain from enforcing termination notices or taking further steps to dismantle the agency. JA238.

That requested relief would not have compelled performance of contractual obligations, enforced bargained-for terms, or provided contract damages. It instead addressed the Executive's unlawful decision to dismantle a congressionally mandated agency. Any incidental restoration of contractual relationships would follow from restoring lawful agency

14

operations—not from judicial enforcement of contract rights. And the requested relief expressly preserved substantial executive discretion in determining *how* to bring Defendants' conduct into compliance with governing statutes.

This case therefore falls well outside the concerns animating *Lujan* and *Center for Biological Diversity.* Gov't Br. 20–21. The PSCA challenges a specific executive decision that inflicted direct, concrete injury on the organization and its members. That is the paradigm of a justiciable controversy under Article III.

### E. The Government conflates standing with the scope of available relief.

Citing *Selia Law LLC v. CFPB*, 591 U.S. 197 (2020), and attempting to draw support from *Collins v. Yellen* and *Andrade v. Lauer*, the Government contends that the PSCA's standing is doomed because its "requested relief" is supposedly "unmoored from its alleged injury and basic remedial standards." Gov't Br. 30–31. That argument fails at the threshold because it conflates two distinct questions: whether a plaintiff has standing to bring a claim and what relief may be awarded if the plaintiff prevails.

Standing turns on injury, causation, and redressability — not on the precise contours of an interim or final remedy. The question at this stage is whether the PSCA may bring its separation-of-powers claims, not what specific remedies may be available.

The Government's reliance on *Seila Law* is therefore misplaced. Gov't Br. 30–31. Like the PSCA here, the law firm plaintiff in *Selia Law* had standing because it suffered injury caused by an unconstitutional exercise of executive authority. That is the relevant comparison. It is immaterial that the requested remedy in *Selia Law* was "to deny the Government's petition to enforce the civil investigative demand" rather than broader structural relief. Gov't Br. 30–31. In every case, the scope of relief flows from the nature of the injury.

In *Selia Law,* the plaintiff law firm's injury arose from the enforcement of a civil investigative demand, and relief tailored to that injury was sufficient to redress it. Here, by contrast, the PSCA's injuries arise from the Defendants' unconstitutional, illegal, and ultra vires dismantling of an entire agency. Relief adequate to address that injury must therefore address the unlawful dismantling itself. A narrow order reinstating PSCA members to positions in a defunct agency — stripped of other personnel,

16

infrastructure, and operational capacity—would not provide meaningful relief. *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 31 n.22 (D.D.C. 2025), appeal pending, No. 25-5144. See also *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) (explaining that when "there is no way to peel off just the portion of the [conduct] that harmed the plaintiff," affording complete relief may require a remedy that addresses the challenged action as a whole).

Nor does *Andrade* assist the Government. Gov't Br. 30. The relief there—reversing reductions in force affecting the plaintiffs—was tailored to the plaintiffs' injuries, which arose from discrete personnel decisions. Here, by contrast, the reductions in force are not independent personnel actions but one of the mechanisms by which Defendants have dismantled the agency itself. Meaningful relief therefore must operate at a similar structural level. That difference reflects the differing nature of the underlying executive action—not any limitation on standing.

In short, the Government's argument improperly collapses standing and remedies into a single inquiry. Article III requires only that plaintiffs have standing to challenge unlawful executive action that caused them injury. The PSCA satisfies that requirement.

17

**F. The Government's APA finality argument does not defeat standing.**

The Government also attempts to recast an APA finality argument as a standing defect, citing *Biden v. Texas*, 597 U.S. 785, 809 (2022). Gov't Br. 27. That contention reflects a category error.

Article III standing asks whether plaintiffs have suffered injury sufficient to invoke the judicial power. "Final agency action," by contrast, addresses whether particular agency conduct is reviewable under the APA. *Bennett v. Spear*, 520 U.S. 154, 161 (1997). Finality is not a prerequisite to Article III standing.

In any event, Defendants' dismantling of USAID constitutes final agency action. Defendants announced that they were "discontinuing" USAID and integrating its remnants into the State Department. JA246. They carried out that decision by eliminating personnel and shutting down agency operations. Public statements likewise confirmed that USAID was being "shut[] down" and had been fed "into the wood chipper." JA747, 764. These actions were neither tentative nor interlocutory. They marked the consummation of Defendants' decisionmaking process, determined

18

rights and obligations, and inflicted concrete legal consequences. See *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016).

### G. The Government's standing theory would place unlawful executive action beyond judicial review.

The implications of the Government's standing theory are stark. Under its view, no private plaintiff could obtain judicial review of a unilateral Executive Branch decision to dismantle a congressionally created agency or refuse to carry out statutory spending mandates. That theory cannot be reconciled with Article III, the Constitution's separation of powers, or controlling precedent. The Framers understood that liberty depends on enforceable limits on Executive power. As Justice Scalia explained, "Without a secure structure of separated powers, our Bill of Rights would be worthless …." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

The PSCA is not asking this Court to superintend USAID's operations or second-guess the Executive's discretionary policy judgments. This case instead challenges a specific executive action: the decision, made without constitutional or statutory authority, to shutter a congressionally mandated agency, in defiance of Congress's express commands. That action inflicted

19

direct, concrete injury on the PSCA and its members and is fully subject to judicial review.

If the Government were correct in its view of standing, the Executive could evade judicial review simply by acting on a sweeping scale. Courts would be disabled from enforcing constitutional and statutory limits precisely when enforcement matters most. Article III does not compel that result. Controlling precedent forecloses it.

## II.  The Contract Disputes Act does not divest the district court of jurisdiction.

The Contract Disputes Act (CDA) channels a limited class of disputes to specialized tribunals. It applies only to disputes that: (a) are "at their essence contractual"; (b) seek contract-type remedies, and (c) fall within the class of disputes "of the type Congress intended" to remove from the district courts' federal-question jurisdiction. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106–13 (D.C. Cir. 2022); *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609–11 (D.C. Cir. 1992); *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982). See also *Free Enter.*

*Fund v. PCAOB*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)).[3]

The Government, like the district court, misapplies these factors—treating the CDA as a sweeping jurisdictional bar whenever a plaintiff happens to have had a contractual relationship with the Government. That is not how the CDA operates. Properly applied, the governing framework confirms that the CDA does not apply here. The PSCA asserts constitutional and statutory, not contractual, limits on executive authority; seeks declaratory and injunctive relief rather than contract remedies; challenges unilateral government action rather than contractual obligations; and raises "fundamental, even existential" questions about our constitutional structure that Congress never intended to channel away from district courts. *Axon Enter. Co. v. FTC*, 598 U.S. 175, 180, 185 (2023).

---

[3] In a footnote, the Government suggests that Tucker Act precedents such as *Crowley*, *Transohio*, and *Megapulse*, might call for a different test for identifying "contractual" claims than cases governed by the CDA. Yet it fails to develop this argument and concedes that any such distinction "does not matter in this case." Gov't Br. 35 n.2.

**A. The PSCA's claims are not "at their essence" contractual.**

The Government's threshold premise—that the PSCA's claims arise from its members' contracts—is wrong. Gov't Br. 36. The relevant inquiry is not whether personal services contracts exist in the factual background, but whether the PSCA's claims are "contract-related" because they assert rights or obligations created by contracts. *Megapulse*, 672 F.2d at 968–69. The PSCA's claims do not.

The PSCA does not allege breach of contract. Its claims neither require nor turn on the incorporation, interpretation, performance, or breach of any PSCA member's contract. Instead, they originate in the Constitution and in "statutory provision[s] expressing the judgment of Congress concerning desirable public policy"—sources of law independent of any contractual undertaking. *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669 (1984); *Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (Bork, J.).

The Government's reliance on cases involving genuine contract claims underscores these points. Gov't Br. 38–39. In *Dep't of Education v. California*, 604 U.S. 650 (2025), the dispute concerned the district court's jurisdiction to "enforce a *contractual* obligation to pay money." 604 U.S. at 651; *id.* at 669

22

n.7 (emphasis added). Likewise, in *Ingersoll-Rand Co. v. United States*, 780

F.2d 74 (D.C. Cir. 1985), the plaintiff's claims were "incorporated into" and

arguably "entirely contained within the terms" of a contract. The case

turned on whether "*the contract* forbids termination." *Id.* at 75, 78 (emphasis

added). In both cases, the source of the asserted rights and the basis for

relief were both contractual. Not here.

The PSCA's claims arise from independent legal sources: the

Constitution, the APA, and appropriations statutes. As a result, they are

not contract claims. See *National Ctr. for Mfg. Sciences. v. U.S.*, 114 F.3d 196,

198, 200–01 (Fed. Cir. 1997) (holding that claims based on appropriations

acts are not "contract-based" claims, fall outside the Court of Federal

Claims' exclusive jurisdiction, and therefore may be reviewed in district

courts under the APA). The fact that Defendants' dismantling of USAID

also terminated contractual employment relationships does not, by some

"mystical metamorphosis," transform the PSCA's constitutional, ultra

vires, and APA claims into contract claims. *Megapulse*, 672 F.2d at 968.

The Government's contrary approach to identifying claims as

"contractual" would reduce *Crowley* and *Megapulse*'s "essence" inquiry to a

but-for test: if a plaintiff once had a government contract, any later injury

23

touching that relationship would become contractual. That is precisely the theory *Megapulse* rejected. *Transohio* and *Crowley* reaffirmed its rejection. And nothing in the CDA alters it.

### B. The PSCA does not seek contract-type remedies.

The CDA applies only to claims seeking contract remedies—relief "specific to actions that sound in contract." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017); see also *Crowley*, 38 F.4th at 1107. The PSCA seeks no such relief.

Instead, the PSCA seeks declaratory and injunctive relief prohibiting unlawful executive action and restoring compliance with statutory and constitutional requirements. That requested relief runs against the Executive's asserted authority, not against any contractual counterparty. And as *Transohio* and *Megapulse* make clear, relief directed at the legality of unilateral government action does not become "contractual" merely because it may have effects on contractual relationships. *Transohio*, 967 F.2d at 610–11; *Megapulse*, 672 F.2d at 969–71.

The Government's contrary arguments are misplaced. Like the district court, the Government tries to manufacture CDA jurisdiction by invoking allegations that no longer exist—deeming it "noteworthy" that the PSCA's

24

original complaint referenced termination-for-convenience clauses in some members' contracts, while the amended complaint "omits but does not disavow" those allegations. Gov't Br. 36, 37, 41; see also JA885–86 (referring to relief requested only in the superseded original complaint but not in the Amended Complaint). That argument fails for a straightforward reason: the Amended Complaint is the operative pleading, and it contains no such allegations. JA214.

Once amended, a prior pleading "ceases to perform any function in the case." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) (quoting 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1476). With narrow exceptions not present here—such as amendments affecting jurisdiction after removal or statute of limitations issues—the Amended Complaint alone defines the claims before the court.

The Government cannot evade that rule by relying on superseded allegations to recharacterize the nature of the claims now asserted. Jurisdiction under the CDA turns on the claims the plaintiff actually brings—not on allegations the plaintiff has abandoned. Because the operative complaint asserts constitutional and statutory claims independent of contract, the Government cannot manufacture CDA

25

jurisdiction by resurrecting allegations the operative pleading has displaced.

### C. The PSCA's claims fall outside the class of disputes the CDA was enacted to govern.

Congress enacted the CDA to create a limited and specialized forum for resolving procurement and contract-administration disputes. Extending CDA jurisdiction to claims like the PSCA's would distort that purpose, converting any large-scale executive action affecting contractors into a contract dispute. Nothing in the CDA's text, structure, or history suggests Congress intended such a sweeping displacement of district-court jurisdiction. See *Axon*, 598 U.S. at 180, 185.

To the contrary, both precedent and "common-sense intuition" confirm the opposite conclusion. *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1336 (D.C. Cir. 2024). It would be "nothing less than remarkable" to conclude that Congress silently assigned constitutional claims of this magnitude to a specialized contract-disputes regime. *Bowen v. Mass.*, 487 U.S. 879, 908 (1988). See also Opening Br. 45 & n.4.

The Government's principal response to this point is to assert, without analysis, that *Axon, Free Enterprise*, and *Thunder Basin* "do not supply the

relevant test" for determining whether the CDA displaces district court jurisdiction. Gov't Br. 41–42. But those cases articulate a general and controlling principle the Government does not confront: implied repeals of jurisdiction are disfavored. Courts do not lightly infer that claims are "of the type Congress intended" to subject to channeling provisions, *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212 ); *id.* at 208 (Gorsuch, J., concurring); *Free Enter. Fund*, 561 U.S. at 489. And courts apply that rule with particular force to constitutional claims. *Webster v. Doe*, 486 U.S. 592, 603 (1988); see also Opening Br. 40–41. The Government cannot satisfy this standard. It identifies nothing in the text or structure of the CDA that clearly displaces district court jurisdiction over claims like the PSCA's. *Id.*

### D. *NIH v. APHA* confirms that claims like the PSCA's belong in district court.

The Supreme Court's recent decision in *National Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025), reinforces the conclusion that the PSCA's claims belong in district court.

Justice Barrett's controlling concurrence in that case drew a clear line between individual grant or contract disputes and public-law challenges to agency policy: challenges to the former sound in contract and belong in the

Court of Federal Claims, but challenges to the latter do not. 145 S.Ct. at

2661. The Government's cursory attempt to distinguish *NIH v. APHA* (at

44)—by again misreading paragraph (f) of the PSCA's preliminary

injunction motion—fails. See *supra* pp. 14–15.

### E. *Dalton v. Specter* does not bar jurisdiction over claims challenging unconstitutional executive action.

In a final effort to recast the PSCA's claims as not "genuinely"

constitutional, the Government cites, in passing, *Dalton v. Specter*, 511 U.S.

462 (1994). Gov't Br. 40. Its reliance on *Dalton* reflects a fundamental

misunderstanding of that decision.

*Dalton* addressed challenges to discretionary decisions Congress had

affirmatively committed to presidential judgment. 511 U.S. at 477. The

Court held that where a statute vests the President with discretion, courts

may not recharacterize challenges to that discretion as constitutional

claims. But *Dalton* did not involve and does not shield executive action

taken in defiance of congressional commands.

To the contrary, it is well settled that when the Executive acts

unconstitutionally, illegally, and ultra vires, district courts retain authority

to review and enjoin that conduct. *Trudeau v. FTC*, 456 F.3d 178, 190 & n.22

28

(D.C. Cir. 2006); *Free Enter. Fund*, 561 U.S. at 491 n.2. *Dalton* did not disturb that settled principle. See *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023).

The Government's contrary interpretation would produce untenable results. Under its theory, the Executive could insulate unconstitutional conduct from judicial review simply by asserting statutory authority. Nothing in *Dalton* provides such extraordinary immunity.[4]

## III.  The equitable factors overwhelmingly favor preliminary injunctive relief.

Except for a single undeveloped assertion in the first paragraph of its brief that the Executive's dismantling of USAID was a "lawful effort" to "restructure" foreign aid, the Government does not defend the legality of its conduct. That silence speaks volumes. Neither Article II nor any statute

---

[4] The Government relies on *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), for its *Dalton* argument. Gov't Br. 40. But *Global Health* addressed challenges to the impoundment of funds, not the shut-down of an entire congressionally created agency. The pending rehearing en banc in *NTEU v. Vought* raises the *Dalton* issue in precisely that context, as to the CFPB. *See* Case No. 25-5091 (D.C. Cir.), Doc. 2153586 (filed Jan. 9, 2026); Doc. 2157204 (filed Feb. 2, 2026). Oral argument is scheduled for Feb. 24, 2026. See *id.*, Doc. 1208806379 (filed Dec. 17, 2025).

remotely authorizes the Executive to unilaterally dismantle USAID and refuse to carry out Congress's appropriations. See Opening Br. 49-55.

The remaining equitable factors for interim relief likewise overwhelmingly favor it. And here again, the Government's arguments are telling. It does not meaningfully engage with the PSCA's showing that the district court misapplied the standards for irreparable harm, the balance of the equities, and the public interest. Compare Gov't Br. 45–50 with Opening Br. 56–63. Instead, the Government's response on these points rests on two flawed premises: first, that the dismantling of a federal agency inflicts no irreparable harm on the employees and associations whose roles depend on it; and second, that the Executive's asserted policy preferences override the ongoing dismantling of a congressionally mandated agency. Neither premise accords with the law or common sense.

### A. Defendants' dismantling of USAID inflicts irreparable harm on the PSCA and its members.

The dismantling of USAID inflicts irreparable harm—on the PSCA and its members—because it destroys the institutional framework that sustains the PSCA's members' positions and professional roles and the Association's organizational purpose and existence.

Once agency operations are terminated, statutory functions halted, and personnel (and their expertise) dispersed, no later judgment can fully restore the statutory scheme Congress enacted and the institutional roles it created. That injury is concrete, immediate, and irreparable and falls directly on the PSCA and its members, whose careers and organizational existence depend on USAID's continued operation.

The Government's attempt to recast these injuries as merely "contract related job losses," Gov't Br. 47, misses the point. It does not answer the relevant question: whether meaningful relief will remain available without interim relief now.

The Government simply does not—and cannot—explain how judicial relief entered years later could restore an agency that has been dismantled, its statutory functions halted, and its workforce scattered. It does not engage with, much less rebut, the reality that denying preliminary relief in "genuinely extraordinary situations" like this, *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974), compromises the possibility of meaningful corrective relief later. See Opening Br. 57–60.

Allowing the Executive to dismantle USAID while this case proceeds risks presenting the courts with a fait accompli, foreclosing effective relief

31

before the legality of shuttering the agency can be determined.

### B. The Government has no cognizable interest in continuing conduct that exceeds its statutory and constitutional authority.

Apart from ignoring the likelihood and magnitude of irreparable harm here, the Government, like the district court, misconstrues the balance of the equities and the public interest by elevating the Executive's asserted policy preferences over Congress's statutory commands. That is not the law. There is "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. Nor does the Executive have any equitable interest in refusing to comply with enacted statutes.

Nor is there any uncertainty, as the district court suggested, about how "to weigh" the public interest against Defendants' asserted interest in "aligning the United States' foreign aid programs with American Values." JA889. Congress has established the public interest here. It mandated, with unmistakable clarity, that USAID is an independent establishment and that appropriated dollars "shall" be made available to USAID "in the amounts specifically designated" to carry out specific statutory purposes. See

Opening Br. 6–11. The Executive cannot nullify those mandates and then invoke its own policy preferences to defeat equitable relief.

The Government also fails to address the unrebutted evidence provided by Physicians for Human Rights documenting the death and devastation resulting from Defendants' dismantling of USAID. PHR Amicus Br. 6–13. That omission is telling. It reflects not a dispute over the equities, but the absence of any answer to them.

The balance of equities and the public interest overwhelmingly favor preliminary injunctive relief here.

## C. Absent preliminary relief, the Government's theory would render unlawful executive action effectively unreviewable.

The Government's position reduces to this: the Executive may unilaterally dismantle any statutory agency now, and courts may address that action, if at all, only after the dismantling is complete. But the Government never explains how meaningful relief could be granted at that point. Preliminary relief exists precisely to preserve the possibility of meaningful relief later.

## CONCLUSION

It would be difficult to imagine a more complete inversion of constitutional first principles than the Government's suggestion that "plaintiff is the one seeking to upend the separation of powers." Gov't Br. 32.

The Constitution vests Congress, not the Executive, with the authority to create (and eliminate) federal agencies and to appropriate funds for their operation. It assigns the Executive the role of executing the laws that Congress enacts, not countermanding them. And since the earliest days of the Republic, courts have enforced these structural limits. Judicial review of unlawful executive action is not an intrusion into the functioning of a coordinate branch. It is one of the means by which the Constitution's separation of powers is preserved and enforced.

The district court's judgment should be reversed. In addition, because circumstances have evolved since the district court denied interim relief, this Court should remand with instructions that the district court consider the appropriate scope of injunctive relief under current conditions. See *J.G.G. v. Trump*, No. 25-5217, 2025 WL 2317650, at *3 (D.C. Cir. Aug. 8, 2025)

34

(per curiam) (vacating preliminary injunction and remanding for further proceedings in light of "changed circumstances," citing 28 U.S.C. § 2106).

This Court should reverse the district court's denial of preliminary injunctive relief and remand for further proceedings consistent with its decision.

Dated: February 19, 2026

Respectfully submitted,

*/s/ Joshua Karsh*

JOSHUA KARSH
*Mehri & Skalet PLLC*
*2000 K Street, NW, Ste 325*
*Washington, D.C. 20006*
*jkarsh@findjustice.com*
*773-505-7533*

MARNI WILLENSON
*Willenson Law, LLC*
*3420 W. Armitage Ave., Ste 200*
*Chicago, IL 60647*
*(312) 546-4910*

CAROLYN E. SHAPIRO*
*Schnapper-Casteras PLLC*
*200 E. Randolph St., Ste. 5100*
*Chicago, IL 60601*
*(773) 520-7533*

*\*Member of the Illinois bar with a D.C. practice limited to federal litigation. Not a member of the District of Columbia Bar.*

35

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations set forth in this Court's Order of June 9, 2025, because it contains 6,308 words, not including the portions excluded by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Book Antiqua font.

Dated: February 19, 2026

*/s/ Joshua Karsh*

## CERTIFICATE OF SERVICE

I certify that, on February 19, 2026, a true and correct copy of this

filing was filed with the Clerk for the United States Court of Appeals for

the District of Columbia Circuit using the Court's electronic filing system,

which will forward a copy to all counsel of record.

*/s/ Joshua Karsh*